UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NOBLE CAPITAL FUND MANAGEMENT, LLC, TXPLCFQ, LLC, and TXPLCFNQ, LLC, | § § § § § | |
| Plaintiffs, | § § | Civil No. 1:20-CV-1247-RP |
| v. | § § | |
| US CAPITAL PARTNERS, INC., JEFFREY SWEENEY, CHARLES TOWLE, PATRICK STEELE, and US CAPITAL GLOBAL INVESTMENT MANAGEMENT LLC, f/k/a US CAPITAL INVESTMENT MANAGEMENT, LLC, | § § § § § § § § | |
| Defendants. | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Noble Capital Fund Management, LLC ("Noble") and TXPLCFQ, LLC, and TXPLCFNQ, LLC (the "Feeder Funds," and, together with Noble, "Plaintiffs") file this First Amended Complaint against US Capital Global Investment Management LLC (formerly known as US Capital Investment Management, LLC) ("USCGIM"), US Capital Partners, Inc. ("US Capital"), Jeffrey Sweeney ("Sweeney"), Charles Towle ("Towle"), and Patrick Steele ("Steele") and state:

### SUMMARY

1.     This dispute arises from US Capital and USCGIM's egregious and repeated acts of fraud, through which Sweeney, Towle, and Steele induced the creation of a limited partnership investment fund, perpetrated the misuse and mismanagement of more than $20 million invested in the fund, and unlawfully collected hundreds of thousands of dollars in fees for services they never

provided.  Noble and the Feeder Funds bring this lawsuit to recover losses suffered at the hands of US Capital and USCGIM and their general partners Sweeney, Towle, and Steele.

2.     Specifically, Sweeney, Towle, and Steele made repeated misrepresentations about their ability to raise capital and operate an investment fund with the purpose of inducing Noble to place millions of investment dollars with US Capital, from which Sweeney, Towle, and Steele could extract excessive fees to the detriment of investors.   Through these fraudulent misrepresentations, USCGIM became the general partner of US Capital / Noble Capital Texas Real Estate Income Fund LP (the "Fund")—an investment fund established to make investments in private lending projects.  In reliance on those repeated misrepresentations, Noble became the Fund's portfolio manager, while the Feeder Funds (whose members are Noble's long-time clients) invested more than $20 million in the Fund owned and operated controlled by US Capital and USCGIM.  Sweeney, Towle, and Steele promised to raise substantial amounts of capital for the Fund.

3.     Once Noble had raised the investor dollars, Sweeney, Towle, and Steele engaged in a string-alone fraud designed to stop Noble from terminating the relationship and forcing Noble to pay approximately $750,000 in excessive fees for services that US Capital and USCGIM promised but never performed.  With their initial fraud and string-along fraud, Sweeney, Towle, and Steele have caused significant damage to Noble's relationship with its clients, who are the sole source of investment dollars for the Fund.  Sweeney, Towle, and Steele's fraud also damaged Noble's relationships with its customers, who are the Fund's borrowers and the sole source of investment return for the Fund.  This lawsuit seeks to hold Sweeney, Towle, and Steele accountable for the damages caused by their fraudulent conduct.

## PARTIES

4.      Plaintiff Noble Capital Fund Management, LLC is a Texas limited liability company with its principal place of business located at 9050 N. Capital of Texas Hwy, Bldg 3, Ste. 130, Austin, Texas 78759.  No member of the LLC is domiciled in California.

5.      Plaintiffs TXPLCFQ, LLC TXPLCFNQ, LLC are Texas limited liability companies with their principal place of business in Austin, Texas.  No member of either LLC is domiciled in California.

6.      Defendant US Capital Global Investment Management, LLC, f/k/a US Capital Investment Management, LLC, is a California limited liability company with its principal place of business located at 555 Montgomery Street, Suite 1501, San Francisco, California 94211.  It may be served through its registered agent, Jeffrey Sweeney, at 555 Montgomery Street, Suite 1501, San Francisco, California 94211, or wherever he may be found.  Each member of the LLC is domiciled in California.

7.      Defendant US Capital is a California corporation with its principal place of business in California.  It may be served through its registered agent, Jeffrey Sweeney, at 555 Montgomery Street, Suite 1501, San Francisco, California 94211, or wherever he may be found.

8.      Sweeney is an individual domiciled in California.  He may be served at his business address, 555 Montgomery Street, Suite 1501, San Francisco, California 94211, or wherever he may be found.

9.      Towle is an individual domiciled in California.  He may be served at his business address, 555 Montgomery Street, Suite 1501, San Francisco, California 94211, or wherever he may be found.

10.     Steele is an individual domiciled in California.  He may be served at his business address, 555 Montgomery Street, Suite 1501, San Francisco, California 94211, or wherever he may be found.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship.  The Court has jurisdiction over Defendants because they committed tortious conduct in the State of Texas and directed tortious conduct to the State of Texas.

12.     Venue is proper in this district because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.  *See* 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

### The Parties

13.     Noble is a private lending institution founded in 2002 to create solid alternative investment opportunities that provide shelter from the volatility associated with many other investment models.  One of Noble's specialty is making private loans to real estate entrepreneurs seeking to acquire residential property in Texas, where they will add value and later sell for profit or refinance into their personal asset portfolio.  These borrowers are Noble's customers.  Noble funds those loans with funds it raises from individual investors, who are Noble's clients.

14.     US Capital is the parent company of a conglomeration of companies, some of which are registered investment advisers and registered broker-dealers.  US Capital describes itself as, among other things, providing "financial advisory services for capital formation through private placements . . . through its registered broker dealer."

15.     Sweeney, Towle, and Steele are all principals of US Capital.

16.     USCGIM is part of US Capital's conglomerate.  It touts that its founder Jeff Sweeney has launched multiple investment funds "and also brought in a majority of [their] investors."   USCGIM claimed that Sweeney had raised hundreds of millions of dollars of investments for funds, and further claimed that it could easily perform the regulatory and compliance work necessary to establish and operate a fund.

17.     Sweeney, Towle, and Steele are all general partners of USCGIM.

Fraudulent Inducement of the Fund's<br>Creation and the Fraudulent "Proposal"

18.     In June of 2016, a mutual business associate introduced Defendants and Noble to each other to explore the possibility of establishing an investment fund through which investors could invest in Noble's private lending company.  US Capital principals Sweeney and Towle expressed interest in Noble's private lending business, especially once they learned that Noble has approximately $125 million in assets under management.  Sweeney and Towle represented that they had access to many institutional investors, and that they were capable of raising hundreds of millions of dollars to support a fund dedicated to investments in private lending.  Noble was interested in the possibility of establishing such a fund, in part because it would allow Noble to fund more and larger loans.  Noble explained that to Sweeney, Towle, and Steele.

19.     On July 5, 2016, Sweeney, on behalf of USCGIM, sent Noble an "introduction letter."[1]  The intent of the letter was to induce Noble to place a significant portion—approximately $25 million—under management with USCGIM, where USCGIM and its principals could extract fees from it.  The letter was rife with fraud.  Sweeney touted US Capital's "inception in 1998," but California Secretary of State records show that US Capital was incorporated—by

---

[1] Exhibit 1, "Proposal."

LegalZoom.com—in 2008.  Sweeney represented that he would "run a wide pitch to investment professionals, institutions, and high-net-worth investors so the offering is subscribed to quickly and with diversity."  Further, he said he would ensure that the offering would "move forward quickly with the capital raise [with] our substantial investor community."  All those statements were false when made.

20.     Sweeney represented that he would "provide a comprehensive suite of investment banking services."  Sweeney further represented that he would "strategically market the offering."  Those, too, were false.

Additional Fraud

21.     USCGIM had two tasks with respect to the Fund: raise capital and ensure regulatory compliance.  USCGIM's unsuccessful efforts on both fronts not only constitute a wholesale failure to live up to its obligations, but they also demonstrate a coordinated scheme to take over Noble's business: USCGIM wanted to learn the private lending business from Noble, usurp Noble's investor and lending network, and oust Noble as Fund manager.

22.     Sweeney's proposal achieved its goal: to pique Noble's interest in doing business with US Capital.  To that end, on December 20, 2016, Noble Capital's principals went to San Francisco to discuss establishing the Fund.  At that meeting, Sweeney, Towle, and Steele repeatedly lied in order to secure Noble's agreement to establish the Fund:

- Sweeney, Towle, and Steele represented that they would raise significant capital into the Fund.  None of them ever raised a dollar for the Fund.

- Towle represented that US Capital had an affiliate which was a "credible and well connected broker dealer" with a "global network of institutional investors" that would raise

capital into the Fund. Towle's global network has yielded exactly zero dollars in investments.

- Sweeney and Towle represented that they would perform due diligence. After Noble paid $100,000 for that work, which USCGIM said would ensure the creation of a compliance Fund, Towle admitted to Noble's management that he and USCGIM did minimal due diligence and simply pocketed a majority of the money; he jokes that was "how the sausage is made."

- Steele represented that he would be responsible for all placement agent services, which services would raise significant capital into the Fund. Both facets of that statement were false.

- Sweeney represented that he had raised millions of dollars for other real estate debt funds and would do the same for the Fund. Both statements were false. Noble came to realize that USCGIM had no retail fundraising base from which to raise the funds it had promised. Instead, USCGIM asked Noble to fund promotional events and marketing materials that USCGIM said would lead to institutional investment. After Noble paid approximately $20,000 for these events, USCGIM used them to market *other investment companies*. Worse yet, the events wholly failed to raise capital, demonstrating that USCGIM's purported funding network in fact did not exist. USCGIM knew it had no investor network, and it never intended to raise money. The marketing and events were a ruse to cover USCGIM's true intention to walk away with the $25 million Noble had raised for the Fund.

- Sweeney represented that his institutional investors would invest between $5 million and $20 million at a time into the Fund with a total capital raise of a quarter of a billion dollars. Towle also represented that he had several "significant" institutional investors ready,

willing, and able to make significant investments in the Fund.  Both representations were false when made.

- Towle represented that he and Sweeney would commence an extensive "road show," traveling the country, pitching the Fund, and raising capital.  They never did.

- Towle represented on multiple occasions that he and Sweeney had extensive contacts in London who would invest in the Fund.  They had no such contacts, and no investments ever occurred.

- Sweeney, Towle, and Steele represented that they would get the Fund listed with Fidelity, TD Ameritrade, Schwab, and Pershing, which would allow the Fund to raise money from investment advisory clients.  They failed to achieve any of those listings.

- Sweeney, Towle, and Steele each represented that they would set up the Fund so it could be sold by registered investment advisors.  They didn't, and it isn't.

- Sweeney, Towle, and Steele represented that they had affiliated "wealth managers" with significant assets under management, a portion of whom would contribute to the Fund. No portion was ever contributed.

- Towle and Steele both represented that the Fund was required to have a placement agent under the federal securities laws.  Steele doubled down on that misrepresentation in a meeting almost a year later, on January 14, 2018.  It is false.  It was another fee grab: Sweeney, Towle, and Steele wanted to pay themselves a fee on investor dollars Noble brought to the Fund.  Ultimately, USCGIM billed Noble for more than $270,000 for work it performed as "placement agent" for the Fund.  There are only two sources of Fund investors: (1) the Feeder Funds, and (2) approximately a dozen limited partners who invested in the funds through a registered investment advisor affiliated with Noble.  None

of those are part of USCGIM's nonexistent "substantial investor community," and fundamental notions of fairness dictate that USCGIM is not entitled to be paid placement fees on capital it did not place.

- Towle represented that US Capital needed to be the general partner of the Fund in order to attract institutional investors.  That was false; US Capital only wanted to be the general partner so it could extract fees from the Fund.

23.     On January 25, 2017, Steele came to Texas to continue the fraudulent scheme. Steele perpetuated the fraud by, among other things, the following:

- Steele attended Noble Capital's quarterly investor meeting in Austin, at which he touted the Fund and represented that US Capital had the ability to raise significant capital for it.

- Steele touted his "significant experience" working with registered investment advisors and represented that the Fund would be set up such that it could be sold by registered investment advisors.

- Steele represented that registered investment advisors would be able to collect their advisor fees through the Fund on the Fidelity and TD Ameritrade platforms.

Unbeknownst to Noble at the time, all of those representations were false.

<u>String-Along Fraud</u>

24.     Relying on US Capital and USCGIM's promises and assurances, Noble pursued discussions with USCGIM.  In early 2017, those discussions culminated in the creation of the Fund pursuant to the US Capital / Noble Capital Texas Real Estate Income Fund, LP Limited Partnership Agreement between USCGIM and the Feeder Funds (the "LPA").[2]  Pursuant to the LPA, USCGIM became the general partner of the Fund, responsible for administration of the Fund.  Noble was

---

[2] Exhibit 2, LPA.

responsible for managing the Fund's investments pursuant to the Management Advisory Services Agreement (the "MASA") that Noble, the Fund, and USCGIM entered into on January 18, 2017.[3]

25.     Almost immediately after the Fund was established, Noble Capital became concerned that US Capital, Sweeney, Towle, and Steele were not delivering on their promises, including the promise that they would raise significant capital for the Fund.  US Capital, Sweeney, Towle, and Steele then began efforts to string Noble Capital along so they could continue to extract fees from the Fund.

26.     On February 10, 2017, Steele convinced Noble Capital that a marketing video was necessary to bring in investors from Sweeney's purported investor network.  Noble Capital paid US Capital for that video.  Steele never sent the video to anybody, and nobody ever invested based on it.

27.     As frustration at Noble Capital grew, the Defendants doubled down on their string-along fraud in an attempt to maintain the Fund's existence and continue to extract fees and other monies from it.  Towle represented that a TD Ameritrade listing would happen as soon as the Fund raised $10 million.

28.     Noble Capital raised the money, but no listing happened.  Towle represented that institutional investors would participate as soon as the Fund raised $20 million.  Once again relying on USCGIM's representations, the Feeder Funds placed the initial investments with the Fund.  The Feeder Funds were set up by Noble and are comprised entirely of Noble's clients—individuals and companies seeking alternative investment opportunities supported by Noble's expertise and long track record of success.  Importantly, the Feeder Funds have collectively invested approximately $21 million into the Fund, the vast majority of the approximately $25 million in total Fund

---

[3] Exhibit 3, MASA.

investments.  The remainder of the funds came from registered investment advisers affiliated with Noble.  Noble Capital raised the money, but no institutional investors ever appeared.  ***USCGIM has not placed a single investment dollar into the Fund.***

29.     Towle represented that institutional investors would participate as soon as the Fund completed an audit.  Noble Capital paid for the audit, but no institutional investors ever appeared.  Towle represented that banks would loan money to the Fund (to enable it to leverage additional loans) as soon as the Fund raised $20 million.  Noble Capital raised the money, but Towle never brought any banks to the Fund.

30.     The string-along fraud spanned the entirety of 2017, during which Towle, Sweeney, and Steele repeatedly and continuously represented that investor dollars were on the verge of flowing in.  At their request, on June 11, 2017, Noble hosted (and paid for) an event in Austin.  Sweeney attended.  Not a single qualified investor attended, and no investments were made.

31.     USCGIM's representations that it could and would raise capital were false when made.  From the outset, USCGIM wholly failed at its task of raising investment dollars.  It did not even make reasonable efforts to raise investments, precisely because it lacked the access to investor capital that it had represented it had during its negotiations with Plaintiffs.  ***In over three years, USCGIM has raised zero dollars for the Fund.***

32.     US Capital and USCGIM acknowledged their collective failures.  Its managing partner Charles Towle wrote in an email in July of 2017: "Good job [Noble], [USCGIM] needs to catch-up!"  He also noted: "We have hit a bit of bumps on the road we need to fix though."  He acknowledged that USCGIM needed to "increase marketing efforts of this asset offering."  He lamented that fund administration—for which USCGIM was solely responsible—was "poor."  Towle was correct on all fronts.

33.     A couple of weeks later, USCGIM sent Noble a $58,000 invoice for services as the Fund's placement agent.  Noble responded:

> So far I have paid $100k and now I have an invoice for an additional $58k, all so I can raise money from my own pool of investors into a fund that I don't control? Seriously... just think about it. Not a single dollar has come from your team, your channels, your network, your connections. And now I need to pay $58k for the privilege?

34.     Towle acknowledged that USCGIM had raised no capital, but promised that "we are targeting our investor base that is not small ticket $100K investors but $500K-5M . . . these sales take a bit longer than normal."  He further promised that USCGIM's fundraising "will gain momentum. for our funds it takes anywhere from 6-15 months . . .  then it expands to huge proportions."  He asked for payment of the invoice, despite the fact that USCGIM had done absolutely no compensable work, because "its [sic] awkward for the regulated side to have inconsistencies here."  **USCGIM has never raised a single dollar for the Fund.**

35.     Still believing the continued representations of upcoming capital influx, on August 29, 2017, Noble hosted (and paid for) another event, this time in Sweeney, Towle, and Steele's hometown of San Francisco.  Again, not a single qualified investor attended, and not a single dollar was invested.

36.     As representations of forthcoming capital persisted, Noble held (and paid for) yet another event in Austin on December 7, 2017.  A US Capital marketing representative attended and used the event *to pitch another investment*.  No money was raised for the Fund.

37.     On August 26, 2018, Sweeney met with one of Noble Capital's principals at a private lending conference in Las Vegas.  Noble Capital's CEO confronted Sweeney about his wholesale failure to deliver on his promises of raising capital.  Noble Capital's CEO explained that the only reason Noble Capital agreed to establish the Fund was because of the multiple

representations about raising significant capital for it.  He explained that Noble Capital would never have agreed to establish the Fund if it had known US Capital, Sweeney, Towle, and Steele would not follow through on their promises.

38.     Sweeney admitted he had raised zero capital, but he asked for six more weeks to land a couple of significant investors he was working on.  Sweeney also admitted that the fees he and US Capital were charging were "exorbitant," especially since they had wholly failed to deliver the capital they had promised.  Of course, Sweeney continued to extract fees but never delivered the significant (or, for that matter, any) investors.

<u>US Capital and USCGIM's breach and scheme to take over<br>Noble's private lending network and interfere with client relationships</u>

39.     Next, USCGIM began demanding that Noble "collapse" the Feeder Funds, such that Noble's long-time clients would be direct investors in USCGIM.  There was no regulatory (or any) reason for that; it was just an attempt to penetrate Noble's network.  Noble responded:

> Twice now we have discussed converting the feeder funds. Each time I have brought the challenges to the table, watched everyone have "ah-ha" moments, and then we move on. Perhaps this time we will need to break it down some more and really try to solve the issue instead of just stating that it needs to happen without thinking it through.

40.     Sweeney, apparently not wanting to think anything through, responded "Let's confer on this.....late into the cocktail reception tomorrow."

41.     Having failed to convince Noble to collapse the Feeder Funds and abandon its clients, USCGIM began attempts to remove Noble from its position as Fund manager.  First, USCGIM began making baseless complaints that Noble had "excessive liabilities," without ever explaining what that meant, much less offering evidence in support.  USCGIM then commenced repeated requests for onerous and useless financial reports from Noble, claiming that "it is our duty to investors to show we made a best practice assessment based on financial data concerning

your future ability to perform to avoid any potential repudiation." Notably, the investors USCGIM claimed to be trying to help are **Noble's** clients.

42.     USCGIM then doubled down, demanding that Noble sign an agreement that would allow USCGIM to terminate Noble as Fund manager at virtually any time and for any (or no) reason. The only possible explanation for that proposed agreement—which Noble flatly refused to sign—is that it was in furtherance of USCGIM's scheme to take over Noble's private lending network.

43.     USCGIM's intent to take over Noble's business and interfere with its client relationships is confirmed by the fact that USCGIM never took its compliance obligations seriously. Specifically, USCGIM sent wires to the wrong title company, never conducted required audits, missed wire cutoff times (forcing Noble to fund loans), sent incorrect statements to investors, and never obtained a Fund listing on TD Ameritrade, which USCGIM said was a precursor to its ability to raise institutional funds. Instead of doing the work it was supposed to be doing, USCGIM spent its time poking around Noble's business, inquiring about Noble's other funds and individual lenders, and asking about origination of loans more than a year and a half after they had been funded.

44.     The dispute snowballed at the end of 2018. Despite the fact that USCGIM had never raised a single dollar for the Fund, it continued to demand payment of "placement fees" in the exorbitant amount of $75,000. When Noble refused to pay (because no fees were due, given that USCGGIM has not raised any money for the Fund), USCGIM indicated that it would not fund any more loans, meaning that investor money would sit idle, generating zero return. USCGIM then began doing exactly what it promised it would do: holding the Feeder Funds' investments hostage in an attempt to extract concessions from Noble on fees USCGIM has never earned and is

not entitled to be paid.  When Noble and Towle agreed that a conversation needed to take place, Sweeney said that he would "rather just have drinks."

45.     USCGIM's actions, including its refusal to fund loans, are calculated to disrupt Noble's relationships with its clients.  Those relationships—and the goodwill and reputation that Noble cultivates to maintain those relationships—are the foundation of Noble's business operations.  Noble and its affiliate entities have been in the private lending business for more than fifteen years.  Noble has contacts, contracts, and longstanding relationships with borrowers, the developers and contractors that owe the Fund money.  Noble also has contacts, contracts, and longstanding relationships with its clients, many of whom are partners in the Feeder Funds.

46.     USCGIM's actions are in fact disrupting those relationships.  Specifically, long-time Noble clients who are also limited partners in the Feeder Funds are complaining about the management of their investment, and some have cut ties with Noble.

47.     USCGIM also confirmed its intent to steal Noble's business for itself in early 2019, when USCGIM began forging documents.  On January 11, 2019, Towle sent an email with the subject "Noble Delinquency Concerns" complaining that "per our MOU and special assets procedures, we noticed that the following loans are not in line with what was agreed on."  The "special assets procedures" document Towle attached was dated August 28, 2018, but Towle had just created it and Noble never agreed to it.  The only plausible reason for Towle's forgery of the document is to claim that Noble is not complying with nonexistent "special asset procedures" so that USCGIM could attempt to oust Noble as Fund manager, which was USCGIM's goal from the start.

USCGIM's pattern of fraud

48.     Plaintiffs are not the first to fall victim to US Capital's fraudulent scheme.  Since this dispute arose, Plaintiffs have discovered that the US Capital conglomeration, together with those entities' principals, have engaged in a pattern of fraud.  For example, in *CTX Virtualtechnologies v. US Capital*,[4] the plaintiff alleged that it paid US Capital a $40,000 due diligence fee (recall Towles' "how the sausage is made") based on the promise that US Capital would fund credit facilities in the amount of $9,500,000.  After the plaintiff paid the due diligence fee, US Capital refused to fund the loan, demanded additional collateral, and extracted even more fees.

49.     In *Riverside Resources v. US Capital*,[5] the plaintiff alleged that it paid a due diligence fee of $85,000 (again, sausage) based on US Capital's promise to fund a credit facility of up to $23 million.  US Capital never funded a single dollar, but it secretly filed a lien on the plaintiff's assets in an effort to extort payment of a $275,000 "break-up fee."

50.     In *Sageant Energy v. US Capital*,[6] the plaintiff alleged that it paid a due diligence fee of $80,000 (yes, sausage) based on US Capital's promise to fund a large credit facility to develop a wind farm.  Despite multiple assurances that funding was forthcoming, US Capital never provided any funding, and the plaintiff eventually lost its opportunity to develop the wind farm.

---

[4] Exhibit 4, Complaint filed in *CTX Virtualtechnologies Inc. v. US Capital Partners, Inc.*, No. CGC-12-521097, in the San Francisco County Superior Court of California.
[5] Exhibit 5, Complaint filed in *Riverside Resources LLC, et al. v. US Capital Partners LLC*, No. CJ-2012-05560, in the Tulsa County District Court of Oklahoma.
[6] Exhibit 6, Complaint filed in *Sagent Energy, LLC v. US Capital Partners, LLC.*, No. 3:14-cv-05432, in the United States District Court for the Northern District of California.

51.     Even more tellingly, in *Brooklands v. US Capital*,[7] the counsel that represented USCGIM in the JAMS proceeding that ensued between USCGIM and Plaintiffs sued US Capital, alleging that his client was fraudulently induced into agreeing to a $1.5 million credit facility. After his client paid a due diligence fee (yes, that again), US Capital never funded anything.  The plaintiff—through US Capital's counsel for the JAMS proceeding—complained that US Capital never intended to comply with their representations,[8] engaged in a "scheme and enterprise to defraud,"[9] and committed not only fraud, but also violations of the federal civil RICO statute.

52.     While the US Capital entities might be able to shake off one (or even two) lawsuits as sour grapes by a former business partner, that will not work with *six* lawsuits, all with virtually identical allegations.[10]  The fact that the US Capital entities have been sued for the same thing so many times leaves one to wonder when the US Capital entities started demanding that its victims agree to confidential arbitration, and how many arbitrations have alleged the same scheme.  Either way, six lawsuits—together with the evidence of USCGIM's fraud on Plaintiffs—is enough to conclusively establish USCGIM's scheme: promise funding, extract a due diligence fee, do nothing, then demand a "break-up fee."  That is fraud.

### The Arbitration

53.     Undoubtedly anticipating that their conduct would give rise to litigation, US Capital Investment Management LLC ("USCIM")—the general partner of the Fund—caused the Fund's

---

[7] Exhibit 7, Complaint filed in *Brooklands, Inc. v. Sweeney.*, No. 9:14-cv-81298, in the United States District Court for the Southern District of Florida.
[8] *Id.* ¶¶ 25, 32.
[9] *Id.* ¶ 34.
[10] In addition to the four lawsuits discussed above, two additional lawsuits include *MCW Energy Group v. US Capital Partners Inc.*, Case No. BC-566570, in the Los Angeles Superior Court of California (attached to Exhibit 8) and *Rapid Auto Loans, LLC v. U.S. Capital Partners, Inc.*, No. 0:16-cv-62066, in the United States District Court for the Southern District of Florida (attached as Exhibit 9).

operating documents to contain arbitration clauses as well as clauses preserving as confidential the proceedings in arbitration.[11]   On January 15, 2019, Noble caused its wholly owned subsidiary Noble Capital Fund Management LLC ("NCFM")—the manager of the Fund—to file an arbitration demand against USCIM.[12]   Prior to filing, Noble representatives met with Sweeney, Towle, and Steele.  At that meeting, the three continued their campaign of extortion by offering to return investor money if Noble paid them one million dollars.  Also at that meeting, Steele *again* falsely represented that a placement agent was required to operate the Fund.

54.   On July 10, 2019, the arbitrator entered an extensive award detailing misconduct on the part of US Capital and its principals.  The arbitrator found that "NCFM is likely to prevail on the merits of its fraud claim."  That claim is based on many of the same representations that give rise to this complaint.  In other words, the merit of Noble's fraud claim has already been established.

55.   As a result of USCGIM's fraudulent conduct, mismanagement of the Fund's assets, and failure to raise any investment dollars, Noble and the Feeder Funds initiated JAMS arbitration proceedings against USCGIM on January 15, 2019.  The sole reason why Plaintiffs brought their claims in an arbitration forum was because USCGIM, along with its principals and other related entities, had fraudulently induced Noble to agree to confidential arbitration provisions—provisions that USCGIM needed to ensure that its fraudulent activity, once uncovered, would be resolved through a confidential arbitration and not through a public lawsuit.

---

[11] The confidentiality protections do not extend to final awards, and all information in this section is taken from the final award attached as Exhibit 10.

[12] TXPLCFQ, LLC, and TXPLCFNQ, LLC—the vehicles through which Noble's clients invested in the Fund, were also Claimants in the arbitration.

56.    Shortly after receiving the demand for arbitration, USCGIM sent Plaintiffs a "Notice of Concerns" signaling its intent to further violate its contractual and fiduciary obligations to Plaintiffs by (1) refusing to fund new loans, which would decimate investor returns; (2) sending a "notification to investors of the Fund that the Fund faces an associated party risk," which had the sole purpose of driving a wedge between Noble and its long-time clients; and (3) adopting new "credit criteria" that would allow USCGIM to refuse to fund draws on existing loans, causing damage to investors.[13]  These actions violated USCGIM's contractual and fiduciary obligations to the Fund and its investors, and they were a departure from the way the Fund had been operated for over two years.

57.    USCGIM then asserted that a freeze on new loans was necessary because "with a 5% or more default rate, [the Fund] will not be viable."  This was nonsense.  A 5% default rate in the private lending business is commonplace, commercially reasonable, and it is the default rate that has existed in Fund investments since inception of the Fund.  Indeed, USCGIM did (or at least said it did) due diligence on Noble's loan originations prior to commencement of the Fund; USCGIM even charged Noble $100,000 for those efforts.  USCGIM unquestionably knew what a reasonable default rate in the private lending business is.  There is no reason—other than retaliation and rank animosity—to refuse to fund new loans on the same terms as they have always been funded.

58.    USCGIM's proposed credit criteria on existing loans had no legitimate purpose either.  Loan draws had been successfully funded under existing criteria for years.  But USCGIM wanted to (1) add the requirement of an "Affidavit on Borrower's payments by Noble Capital Group, LLC," whatever that means; (2) change the way origination fees are charged; and (3)

---

[13] Exhibit 11, Notice of Concerns.

demand a whole host of information that is either proprietary to Noble, irrelevant, or useless.  The only reasonable explanation for the proposed credit criteria is to make it easier for USCGIM to refuse to fund loans.  Finally, USCGIM's proposed "notification to investors of the Fund that the Fund faces and associated party risk" was likewise without any legitimate basis.

59.     Then, without any basis, USCGIM management informed Noble that USCGIM intended to use investor money to pay for its defense of the JAMS arbitration.  This, too, violated the contractual and fiduciary obligations that USCGIM had as the general partner of the Fund.  In effect, USCGIM sought to use investor funds to defend its own misconduct in mismanaging those very same funds.

60.     Because the "Notice of Concerns" constituted impermissible retaliation for Plaintiffs' demand for arbitration and signaled USCGIM's readiness to further mismanage funds, violate its obligations, and damage investors, Plaintiffs initiated emergency proceedings before JAMS on January 30, 2019, seeking an injunction to stop USCGIM from executing on its threats.

61.     The parties proceeded to arbitrate Plaintiffs' request for injunctive relief.  At every step of the way, USCGIM fashioned new methods of dissipating investor funds, interfering with Noble's investor relations, and flouting its contractual obligations.  For example, USCGIM failed to provide a redemption request form to an investor as requested, and it reduced the value of investor accounts by almost 10%, which gave the false impression of lost principal to the Fund's limited partners.  Noble repeatedly brought USCGIM's misconduct to the attention of the JAMS arbitrator.[14]

62.     In addition, USCGIM used the Fund—a non-party to the arbitration—as a vehicle to harass Plaintiffs and further siphon off investor dollars.  On May 20, 2019, the Fund filed a

---

[14] Exhibits 5-7, First, Second, and Third Notices of Ongoing Misconduct.

lawsuit in federal district court against Noble.  USCGIM impermissibly used the Fund's assets to finance that lawsuit against Noble, all to advance its goal of forcing Noble to expend resources and efforts to defend against baseless claims.  Attorneys for the Fund also sought to observe the JAMS arbitration proceedings in order to gather information related to the federal court lawsuit. Those attorneys, too, were impermissibly paid with the Fund's capital.

63.     In sum, the JAMS arbitration not only revealed evidence of USCGIM's prior improper dealings and fraudulent conduct, but it also offered a real-time view of USCGIM's ongoing misconduct, retaliatory practices and improper use of Fund assets.

<u>The JAMS Emergency Arbitration Award and USCGIM's continued retaliation</u>

64.     On July 10, 2019, after considering USCGIM's persistent misconduct (as documented through evidence presented through numerous filings and hearings), the JAMS emergency arbitrator issued a 62-page reasoned partial award (the "July 10 Emergency Award") finding that Plaintiffs had demonstrated a likelihood of success on the merits of their claims (substantively the same as those alleged in the present lawsuit) and granting Plaintiffs much of the injunctive relief they had sought.[15]   Among other things, the arbitrator granted Plaintiffs the following remedies:

- "Respondent [USCGIM] is hereby enjoined from ***using or causing the Fund to use Partnership capital to pay*** for all or any portion of (1) the lawsuit filed on May 20, 2019 by the Fund in the U.S. District Court for the Northern District of California against [Noble] and various [Noble]-affiliated entities and individuals (the "Fund's Lawsuit") and (2) the investigation that counsel for the Fund, Bahram Seyedin-Noor of Alto Litigation, PC ("Mr. Seyedin-Noor"), represented at the

---

[15] Exhibit 12, July 10 Emergency Award.

telephonic hearing in this Proceeding on May 23, 2019 had formed the basis of the Fund's Lawsuit filed by his firm (the "Fund's Investigation")."

- "Respondent [USCGIM] is hereby required to provide a sworn statement *identifying all expenditures of Partnership capital from Fund inception to present*, excluding expenditures used to fund loans or loan draws.  Such statement shall be provided to Claimants' counsel within ten (10) calendar days of the date of this Award."

- "Respondent [USCGIM] must do the following no later than ten (10) calendar days after the date of this Award.  *These are continuing obligations and shall remain in effect through and including such date as the Emergency Arbitrator or the Merits Arbitrators determine otherwise* in accordance with Rule 2(c)(v):

    (i)    **Bank Account Access**.  Provide [Noble] with view-only access to all Partnership accounts at financial institutions.

    (ii)   **Partnership Capital Segregated Account**.  Maintain Partnership capital in a segregated account.

    (iii)  **Investor Statements, Quarterly Returns**.   Generate investors statements and issue quarterly returns on a timely basis pursuant to the LPA.

    (iv)  **Redemption Requests**.  Honor all redemption requests on a timely basis pursuant to the LPA.

    (v)   **Cooperation with [Noble]**.  Cooperate with [Noble] in connection with its performance of services under the MASA in such a manner as to maximize returns for investors in the Partnership.

(vi) **Payment to Soliciting Advisors**.  Pay licensed soliciting advisors (i.e., Brooklynn Willey) fees that are due and continue to pay any and all such fees on a timely basis as they become due.

(vii) **Payment Under MASA Section 3**.  Pay all fees that are due (and past due) pursuant to MASA Section 3 and continue to pay any and all such fees on a timely basis as they become due.

(viii) **Loan-Loss Reserves**.   Establish and fund a loan-loss reserve account in an amount appropriate to protect investor capital."

65.     The July 10 Emergency Award unambiguously ordered USCGIM to cease its fraudulent practices and correct its mismanagement and misuse of Fund assets.  Yet, the award did not quell USCGIM's appetite for misconduct and retaliatory practices against Plaintiffs, so JAMS tried again.

66.     On October 1, 2019, a three-arbitrator panel issued an additional partial award (the "October 1 Award"), reaffirming that USCGIM had improperly used and mismanaged investor funds and modifying the July 10 Emergency Award.[16]  The panel reiterated that the Fund and USCGIM were prohibited from using investor capital.  Specifically, the panel ordered:

- The Fund and USCGIM, "and their officers, agents, servants, employees, attorneys, or other persons who are in active concert or participation with them, *are enjoined from spending or otherwise disposing of partnership capital* absent further order from the Panel or written stipulation between counsel."

---

[16] Exhibit 13, October 1 Award.

- "Said funds **shall be placed in a separate blocked account** within 5 days of this Order and the Fund shall advise Noble Capital and the Panel of its location and account number."

- "Said funds **shall remain in said account** until the Merits Panel determines where such funds should be dispersed."

67.     The JAMS arbitrators' rulings are unequivocal: USCGIM is (1) prohibited from spending Fund assets without an order from the Panel or the parties' agreement; (2) required to segregate Fund assets and provide Noble with a view of the Fund's accounts; and (3) required to ensure that the funds remain segregated *until the arbitration hearing on the merits of Plaintiffs' claims.*

### USCGIM's plan to terminate the JAMS proceedings prior to a merits hearing

68.     Undeterred, USCGIM and the Fund sought another way to undo the arbitrators' rulings: they orchestrated the termination of the entire proceedings.

69.     In August of 2020, the Fund, feigning lack of resources and inability to pay its arbitration fees, sought to force *Noble* to pay the Fund's arbitration fees so that the matter could remain in arbitration.  The Fund provided no evidence of its alleged inability to pay nor did it explain why USCGIM, as the Fund's general partner, could not cover its expenses.  The Fund asked that the proceedings be terminated if Noble refused to pay the Fund's share of expenses. Noble declined, as it has no obligation to finance a lawsuit against itself—an action that was brought solely to harass Noble and to further dissipate the very resources that the arbitration proceedings sought to preserve.

70.     Nevertheless, USCGIM's scheme worked; on August 31, 2020, JAMS terminated the entire proceedings.[17]  As of October 26, 2020, the JAMS proceedings were deemed closed.[18]

71.     The JAMS proceedings were terminated abruptly and prematurely.  The merits of Plaintiffs' claims—on which JAMS found Plaintiffs had a likelihood of prevailing—were yet to be heard at the final merits hearing before JAMS, which had been set for January 2021.

72.     In short, USCGIM was dissatisfied with the result of the JAMS hearings and rulings because the awards exposed its fraud, mismanagement, and self-dealing that pervaded the entire transaction.  But instead of pursuing its defenses or attempting to reach an alternative resolution, USCGIM sought an easy way out of the dispute: it unilaterally dismantled the arbitration.

73.     Deprived of their ability to pursue the merits of their claims in arbitration (which had been instituted only because *USCGIM* had insisted on confidential arbitration clauses in all agreements), Plaintiffs now seek their day in court.

   <u>USCGIM's use of the termination of the JAMS proceedings to pursue its lawless behavior</u>

74.     USCGIM derailed the JAMS proceedings not only to prevent further detrimental orders by the arbitration panel, but also in an attempt to eviscerate the two written, reasoned, and binding awards that the arbitrators had already issued.

75.     Indeed, days after the JAMS proceedings were deemed closed, USCGIM instituted new access protocols for the Fund's bank accounts—accounts that, pursuant to the arbitrators' awards, were to remain segregated, were not to be used by USCGIM, and were to remain accessible and visible to Noble.  Allowing Noble access and visibility into the Fund's accounts is highly important and necessary to ensure that the Fund's assets are not mismanaged and misused

---

[17] Exhibit 14, JAMS Ruling on Motion for Fees and Terminating Proceedings.
[18] Exhibit 15, JAMS Notice of Closing File.

by USCGIM, as they previously were. Indeed, prior to the recent changes that USCGIM made to the Fund's bank accounts, Noble had access to the systems of USCGIM, such that it had a view into the cash that was on-hand at the Fund. USCGIM's recent actions have prohibited Noble from having such access. ***Despite repeated requests from Noble, USCGIM has refused to reinstate Noble's account access, which evidences USCGIM's intent to abscond with the investor dollars in that account.*** USCGIM's actions further confirm that it (1) no longer deems the July 10 Emergency Award and October 1 Award valid and binding and (2) readily takes actions in violation of those awards.

<u>Fraudulent Arbitration Clause</u>

76.     US Capital, Sweeney, Towle, and Steele have a lengthy history of similar fraudulent schemes, and they have gone to great lengths to conceal that history from potential business partners. One method they use to hide their fraud from public view is to insert confidential arbitration clauses in the contracts they prepare. But just as they engage in lies of commission and omission to induce potential business partners to execute their contracts, they also engage in lies of commission and omission to induce potential business partners to assent to confidential arbitration clauses. That is precisely what they did with Plaintiffs.

77.     Prior to the execution of any agreement, Plaintiffs' principal Chris Ragland met with Towle. Ragland inquired about prior disputes involving US Capital and its principals. Towle represented that he and US Capital had only been involved in a couple of lawsuits, all of which had been baseless and all of which had been settled quickly. Steele also represented he had never been involved in any dispute; indeed, he touted the fact that he had never had a customer complaint. Those were lies of commission: the truth was that US Capital and its principals had been involved in a whole host of lawsuits involving serious allegations of misrepresentations made by US Capital

principals—mostly about their ability and intent to raise investment capital—in order to secure business deals. Those were also lies of omission: in addition to the myriad of lawsuits against US Capital and its principals, on information and belief, there have been an additional myriad of confidential arbitrations involving similar allegations.

78.     Towle and Steele lied with the singular purpose of inducing assent to a confidential arbitration clause. They had learned from experience that the practice of lying to potential business partners to obtain their business results in disputes, that disputes lead to litigation, and that the public nature of litigation makes it more difficult to defraud others. Put simply, if Towle and Steele tell someone that they can and will raise capital and that person can see on PACER that everybody to whom they make that representation sues them for fraud, that person is unlikely to believe their lie. An arbitration clause—specifically a confidential arbitration clause—is required to perpetuate the scheme.

79.     Just as they fraudulently induced Plaintiffs' execution of contracts with representations of ability and intent to raise capital, they separately induced Plaintiffs' assent to confidential arbitration clauses with representations of a clean history of complaints against them and failures to disclose that they had perpetrated similar schemes on others but had successfully funneled the resulting disputes into confidential arbitration. Specifically, US Capital Investment Management LLC ("USCIM"), the general partner of the Fund, caused the Fund's operating documents to contain arbitration clauses as well as clauses establishing blanket confidentiality over all proceedings in arbitration. Plaintiffs assented to those clauses only because of the misrepresentations and failures to disclose described above.

80.     After Plaintiffs learned of the larger fraud scheme described in this Complaint, Towle confirmed the nature of the separate scheme to obtain assent to confidential arbitration

clauses.  Specifically, when initial efforts at settling the dispute failed, Towle told Ragland that he was used to seeing settlements fail.  Towle explained that he had been involved in other disputes, and knew from experience that US Capital's clients would only agree to confidential settlements after being forced to spend large sums of money on the arbitration process.  Indeed, US Capital, Sweeney, Towle, and Steele inserted confidential arbitration clauses requiring disputes to be heard by three arbitrators—rather than one—for the precise purpose of increasing the costs of dispute resolution.

81.     US Capital, Sweeney, Towle, and Steele's conduct in related litigation also confirms the nature of their scheme to keep their fraud shielded in the penumbras.  Specifically, they demanded that Plaintiffs file a motion to seal a pleading, which Plaintiffs were forced to do under the arbitration clauses to which they never assented.  *See* Doc. No. 13, *Noble Capital Group LLC v. US Capital Partners, Inc.*, No. 1:19-cv-01255 (W.D. Tex. Feb. 13, 2020).

82.     In sum, US Capital, Sweeney, Towle, and Steele engaged in a scheme designed to fraudulently obtain assent to arbitration clauses in an effort to prevent the public from learning of their fraud.  As a result of their fraud, US Capital, Sweeney, Towle, and Steele obtained assent to confidential arbitration clauses; however, assent procured by fraud is no assent at all.

### CAUSES OF ACTION

#### A.     Fraud and Fraudulent Inducement (against USCGIM)

83.     Plaintiffs adopt and incorporate the preceding paragraphs as if fully set forth herein.

84.     USCGIM promised to deliver hundreds of millions of dollars in investor capital, which it knew it could not deliver, in order to induce the Feeder Funds to agree to the LPA establishing the Fund, to induce Noble to agree to the MASA, and to induce Plaintiffs to place $25 million worth of investor dollars under USCGIM's control, where USCGIM could extract fees at

its leisure.  USCGIM represented that it would (and could) match that contribution by raising a quarter of a billion dollars.

85.    From the outset, USCGIM knew its promises were false or made them recklessly, as a positive assertion, and without knowledge of their truth. USCGIM nevertheless made these misrepresentations with the intent to induce Plaintiffs to reasonably rely on them and agree to fund USCGIM's unlawful scheme.

86.    Based on and in reliance of USCGIM's misrepresentations, Noble agreed to and entered into the MASA and the Feeder Funds placed investor dollars under USCGIM's control.

87.    Plaintiffs were injured as a result of USCGIM's misrepresentations by the loss of capital, goodwill, and professional reputation and expending their time, energy, and resources to the manage the Fund's investments and without USCGIM fulfilling its contractual obligations and therefore seek to recover Plaintiffs' damages.

88.    Because USCGIM's conduct was malicious and intended to harm Plaintiffs and involved an extreme degree of risk to Plaintiffs (of which USCGIM were aware and consciously ignored), Plaintiffs also seek to recover exemplary and punitive damages.

**B.  Fraud (against US Capital, Sweeney, Towle, and Steele)**

89.    Plaintiffs adopt and incorporate the preceding paragraphs as if fully set forth herein.

90.    As set forth above, US Capital, Sweeney, Towle, and Steele made a multitude of misrepresentations and failures to disclose.  They either knew the representations were false or made them recklessly as a positive assertion without any knowledge of their truth.  By their representations, US Capital, Sweeney, Towle, and Steele intended to induce Noble to act upon them, and Noble actually and justifiably relied on the representation, incurring damages as a result. Because US Capital, Sweeney, Towle, and Steele acted as joint tortfeasors, they are jointly and

severally liable for any judgment.  They are also liable for exemplary damages as a result of their fraud.

91.      Sweeney, Towle, and Steele are principals and general partners of US Capital.  US Capital and USCGIM acted through Sweeney, Towle and Steele in making the above-referenced misrepresentations.  Sweeney, Towle, and Steele knew these misrepresentations to be false when made or made them recklessly as a positive assertion without any knowledge of their truth.  Sweeney, Towle, and Steele nevertheless made these representations to induce Plaintiffs to fund its fraudulent scheme.  Because US Capital had no ability—or even interest—in raising capital for the Fund or properly managing the Feeder Funds' investments, Plaintiffs suffered extensive damages.

92.      Sweeney, Towle, and Steele are individually liable for their respective fraudulent acts regardless of whether they were acting with the scope of their employment with US Capital when they made their misrepresentations.

**C.  Fraudulent Inducement (against US Capital, Sweeney, Towle, and Steele)**

93.      Plaintiffs adopt and incorporate the preceding paragraphs as if fully set forth herein.

94.      US Capital, Sweeney, Towle, and Steele procured assent to confidential arbitration clauses by fraud.  They falsely represented that they had been involved only in minimal litigation, even though they knew that to be false at the time it was asserted, and failed to disclose that they had an additional history of confidential arbitrations, all involving allegations of schemes similar to the fraud described in this complaint.  They did so with the intent to obtain assent to confidential arbitration clauses; indeed, that was necessary to the success of their scheme to shield their larger fraud from public view.  Had Plaintiffs known the truth—that US Capital and its principals had a lengthy history of both litigation and (on information and belief) confidential arbitration—

Plaintiffs would not have agreed to either the confidential arbitration clause or to do business with US Capital.  As a result of US Capital, Sweeney, Towle, and Steele's fraudulent procurement of Plaintiffs' assent to confidential arbitration clauses, Plaintiffs have suffered damages to its customer relationships because—among other reasons—Plaintiffs are unable to openly communicate with their customers about the status of the terminated arbitration.

**D.      Conversion (against USCGIM)**

95.      Plaintiffs adopt and incorporate the preceding paragraphs as if fully set forth herein.

96.      The Feeder Funds delivered to USCGIM over $20 million for safekeeping, which was intended to be segregated from USCGIM's other investments and delivered in substantially the same form as it was received. USCGIM does not have a title claim to these funds.

97.      Nevertheless, the Feeder Funds' investment wrongfully remains in the possession of USCGIM. By holding the Feeder Funds' investments hostage, USCGIM has unlawfully exercised dominion and control over the money for its own benefit.  Specifically, USCGIM mismanaged these funds and used them for its own improper purposes, including developing separate projects and funding vexatious proceedings against Noble.

98.      This conversion proximately caused injury to the Feeder Funds and to Noble.

99.      Moreover, USCGIM's conversion was malicious and was carried out with the intent to cause substantial injury to Plaintiffs, and it involved an extreme degree of risk to Plaintiffs, of which USCGIM was aware and consciously ignored.

100.      USCGIM's unlawful conversion entitles Plaintiffs to recover their investments, as well as to an award of damages, including exemplary and punitive damages.

**E.      Breach of Fiduciary Duty (against USCGIM)**

101.      Plaintiffs adopt and incorporate the preceding paragraphs as if fully set forth herein.

102.     USCGIM owes the Feeder Funds a fiduciary duty due to its position as the general partner of the partnership that led to the creation of the Fund.  While the LPA contains a provision waiving fiduciary duties, it was limited "so long as such action is reasonably believed by the General Partner to be in, or not inconsistent with, the best interests of the Limited Partnership." LPA § 15.3(b).  Accordingly, no fiduciary duties were waived with respect to this claim due to USCGIM's failure to act in the best interest of the Fund.

103.     By mismanaging and engaging in self-dealing with Fund assets, using Fund assets to finance litigation against Plaintiffs, and refusing to fund loans—as is required to advance the Fund's objections—USCGIM did not act in the best interest of the Feeder Funds and thus breached its fiduciary duty.  USCGIM also breached its fiduciary duty by charging excessive fees for work it never performed.  In sum, USCGIM has effectively held Noble's payments and the Feeder Funds' investments hostage as a way to continue perpetrating its fraudulent scheme, which constitute egregious breaches of its fiduciary duties to Plaintiffs.

104.     The Feeder Funds are entitled to recover all profits, proceeds, or financial gains of any kind that USCGIM received and continues to receive as a result of its breach of fiduciary duties.

105.     Further, USCGIM's breach was malicious and intentional, for which the Feeder Funds are entitled to an award of exemplary and punitive damages.

**F.     Breach of Contract (against USCGIM)**

106.     Plaintiffs adopt and incorporate the preceding paragraphs as if fully set forth herein.

107.     Noble and the Feeder Funds have complied with all obligations under the LPA and the MASA.

108.    USCGIM has breached the terms of the LPA and the MASA by refusing to raise capital and issue loans, and by extracting unearned and unearned and illegal management fees from the Fund, all of which have caused the Feeder Funds to incur significant damages.

109.    Plaintiffs bring suit to recover the damages they have suffered as a result of these acts of breach as well as attorneys' fees and costs.

## G.    Tortious Interference (against USCGIM)

110.    Plaintiffs adopt and incorporate the preceding paragraphs as if fully set forth herein.

111.    USCGIM was aware of Noble's existing client relationships and the value that those relationships have to Noble's business operations.  USCGIM engaged in numerous intentional acts to cause investors—Noble's clients—to blame Noble for USCGIM's own management of investor funds.  Specifically, USCGIM took actions that prevented Noble's clients from being properly managed thereby causing clients to cut ties with Noble. But for USCGIM's wrongful conduct, there is a reasonable probability that Noble would have entered into new and additional business relationships with these clients.

112.    USCGIM's actions of interfering with Noble's existing client relationships were intentional and wrongful.  USCGIM's conduct was not privileged, was unjustified, and was intended to harm Noble.

113.    As a proximate result of USCGIM's interference, Noble's clients cut ties with Noble.  This loss of clients caused significant damages to Noble, including loss of business goodwill, reputational damage, and loss of profits for which it now seeks recovery.

114.    USCGIM's tortious interference was done with malice and with intent to harm Noble, for which the law allows recovery of exemplary and punitive damages.

H.     **Conspiracy (against US Capital, Sweeney, Towle, and Steele)**

115.     Plaintiffs adopt and incorporate the preceding paragraphs as if fully set forth herein.

116.     US Capital, Sweeney, Towle, and Steele conspired with one another to perpetrate a fraud on Plaintiffs and therefore should be held civilly liable.

117.     US Capital, Sweeney, Towle, and Steele were each a member of a combination of two or more persons, and the object of the combination was to perpetrate the fraudulent schemes described in this complaint.  They had a meeting of the minds as to the course of action and at least one of the members committed an unlawful, overt act to further the course of action.  Specifically, Defendants Sweeney, Towle, and Steele misrepresented USCGIM's ability and willingness to raise investor capital in order to induce Plaintiffs to participate in establishing the Fund.  These representations were false, and US Capital, Sweeney, Towle, and Steele knew them to be false when made.  Nevertheless, US Capital, Sweeney, Towle, and Steele decided together to make these representations to induce Plaintiffs to fund its fraudulent scheme.

118.     US Capital, Sweeney, Towle, and Steele further induced the Feeder Funds to contribute over $20 million in investments by representing that it would (and could) match that contribution by raising a quarter of a billion dollars.

119.     Plaintiffs suffered injury and damages as a result of US Capital, Sweeney, Towle, and Steele's fraudulent misrepresentations in the form of the lack of management or ability to raise capital for the Fund or and improperly managing the Feeder Funds' investments.  US Capital, Sweeney, Towle, and Steele are also liable for exemplary damages as a result of their participation in the conspiracy.

**CONDITIONS PRECEDENT**

120.    All conditions precedent to recovery for the claims asserted herein have occurred, been performed, or been waived.

**ATTORNEYS' FEES**

121.    Plaintiffs are entitled to an award of their reasonable and necessary attorneys' fees and expenses incurred in this lawsuit.

**DEMAND FOR JURY**

122.    Plaintiffs respectfully demand trial by jury on all issues so triable.

**PRAYER**

WHEREFORE, Plaintiffs respectfully request that Defendants be summoned to appear and answer, and that the Court, on final trial or hearing, enter judgment against Defendants and award Plaintiffs their compensatory and punitive damages, together with attorneys' fees and expenses and such other and further relief as to which they are justly entitled.

[signature page follows]

Dated: August 24, 2022

Respectfully submitted,

/s/ Jason M. Hopkins
Jason S. Lewis
Texas Bar No. 24007551
Jason.Lewis@DLAPiper.com
Jason M. Hopkins
Texas Bar No. 24059969
Jason.Hopkins@DLAPiper.com
**DLA Piper LLP (US)**
1900 N. Pearl Street
Suite 2200
Dallas, Texas 75201
214-743-4546 – telephone
972-813-6267 – facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that on August 24, 2022, a copy of the foregoing document was served on all attorneys of record via the Court's electronic filing system.

/s/ Jason M. Hopkins
Jason M. Hopkins