IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NOBLE CAPITAL FUND MANAGEMENT, LLC, TXPLCFQ, LLC, and TXPLCFNQ, LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:20-CV-1247-RP |
| US CAPITAL GLOBAL INVESTMENT MANAGEMENT LLC, formerly known as US Capital Investment Management, LLC, US CAPITAL PARTNERS, INC., JEFFREY SWEENEY, CHARLES TOWLE, and PATRICK STEELE, | § § § § § § § § | |
| Defendants. | § § | |

## ORDER

Before the Court is a motion for summary judgment filed by Defendant US Capital Global

Investment Management LLC ("USCGIM"). (Dkt. 114).[1] Plaintiffs Noble Capital Fund

Management ("Noble Capital"), TXPLCFQ, LLC, and TXPLCFNQ, LLC (collectively, "Plaintiffs")

filed a response, (Dkt. 115), and USCGIM filed a reply, (Dkt. 117). Having considered the parties'

arguments, the factual record, and the relevant law, the Court will deny Defendants' motion in large

part.

## I. BACKGROUND

### A. The Parties

Plaintiff Noble Capital Fund Management, LLC ("Noble Capital") is the operations arm of

Noble Capital Group, LLC, an Austin-based real estate lender. (Am. Compl., Dkt. 40, at 4).

Plaintiffs TXPLCFQ, LLC and TXPLCFNQ, LLC (the "Feeder Funds") are Texas limited liability

pooled capital funds comprised of roughly 110 investors, all of whom are Noble Capital's clients.

---

[1] The case is stayed as to Defendants US Capital Partners, Inc., Jeffrey Sweeney, Charles Towle, and Patrick Steele pending arbitration. (Order, Dkt. 110).

USCGIM is an investment management company. It is the subsidiary of Defendant US Capital Partners Inc. ("US Capital"). Jeffrey Sweeney ("Sweeney"), Charles Towle ("Towle"), and Patrick Steele ("Steele") are executives of US Capital.

The US Capital/Noble Capital Texas Real Estate Income Fund, LP, ("the Fund"), is not a party to this action, though it plays a major role in the dispute. It is a Delaware limited partnership created by the Feeder Funds and USCGIM. The Fund is managed by USCGIM, but Noble Capital was responsible for managing investments and loans made with the Fund's money.

### B. The Agreements

The parties' dispute revolves around three contracts (collectively, 'the Agreements"). First, Noble Capital and USCGIM are signatories to the Management Advisory Services Agreement ("MASA"). (MASA, Dkt. 5-1, at 84). The MASA stipulates that Noble Capital will provide its expertise in investments, and that USCGIM will pay Noble Capital 70% of the carried interest of the investments. (*Id.*). The MASA states that it "shall be governed by the law of the State of California" and includes a requirement to arbitrate all claims. It contains a standard merger clause. In an arbitration section, it states, "No promises or representations have been made to [Noble Capital] to induce Noble Capital to sign this Agreement." (*Id.* at 90).

Second, the Limited Partnership Agreement ("LPA") applies to the Feeder Funds and USCGIM. (LPA, Dkt. 5-1, at 26). Its objective is to achieve consistent income for the Fund by making loans in the Texas real estate market. It makes USCGIM the general partner of the Fund and makes the Feeder Funds limited partners. It provides USCGIM with the "sole and absolute discretion" to make decisions for the good of the Partnership, but also notes that it must be "reasonably believe[d] by [USCGIM] to be in, or not inconsistent with, the best interests of the Limited Partnership." (*Id.* at 68). The LPA states that disputes will be governed by Delaware law, and similarly contains an arbitration clause. It states that "no Limited Partner has executed and

entered into this Agreement in reliance on any representation, arrangement, agreement or understanding" not in the LPA. (*Id.* at 73).

Third, the Placement Agent Agreement ("PAA") applies to USCGIM, Noble Capital, and US Capital Global Securities, Inc. ("USCGS"). (PAA, Dkt. 35-4). The PAA engages USCGS to raise up to $250 million in investor funds. It says that the PAA "shall be governed by" California law. (*Id.* at 5). In an arbitration section, it states, "No promises or representations have been made to [Noble Capital] to induce [Noble Capital] to sign this Agreement." (*Id.* at 7).

### C. Factual History

In 2016, the parties began negotiations to explore the possibility of establishing a fund so that people could invest in Noble Capital's private lending company. (*Id.*). In January 2017, the parties agreed to create Fund, a private investment fund to invest in the Texas residential real estate market.[2] The parties entered into further management agreements, where Noble Capital agreed to be responsible for managing the Fund's investments, but USCGIM would be the general partner of the Fund and responsible for its administration. (*Id.* at 9–10). The stated goal was to combine Noble Capital's private lending experience with USCGIM's ostensible ability to raise capital to invest in Texas real estate.

USCGIM represented that it could raise substantial investment money for the joint fund. Jeff Sweeney and Charles Towle, both executives at US Capital, represented that they could raise hundreds of millions of dollars to support a private lending fund. (*Id.* at 5). Sweeney represented that he would move forward quickly with raising capital and pitch the investment to high-net-worth investors. (*Id.*). He also offered USCGIM's expertise with regulatory and investment banking services. (*Id.*). Most importantly, USCGIM alleged that it could raise up to $250 million in investor money to put into the Fund. USCGIM told Plaintiffs that it must be the general manager of the

---

[2] The Fund has filed a separate lawsuit against Noble Capital and its managers, *Noble Cap. Texas Real Estate Income Fund, LP v. Newman et al.*, No. 1:22-CV-652-DAE, (W.D. Tex. filed July 5, 2022).

Fund in order for it to be listed on trading platforms and to raise the $250 million. (Ragland Decl., Dkt. 115-1, at 4–5).

Unbeknownst to Plaintiffs, USCGIM allegedly lacked the ability to follow through on these promises. Plaintiffs allege that USCGIM stated it had never been sued or declared bankruptcy, when it had in fact been sued several times for failing to raise capital for joint ventures. (Due Diligence Questionnaire, Dkt. 115-1, at 17). When Noble Capital asked USCGIM to put its commitment to raise capital into writing, USCGIM allegedly claimed it could not do so because of FINRA regulations. (Sweeney Depo., Dkt. 115-3, at 122:7). Noble Capital alleges that USCGIM misrepresented when it was founded—saying that the company had operated since 1998, when in fact it was incorporated in 2008. (Am. Compl., Dkt. 40, at 5–6). Plaintiffs conclude that the operation was simply a scheme so USCGIM could gain access to Noble Capital's contacts in the private lending market and take its capital, without any intent to actually carry through on its promises. (*Id.* at 5–7).

Unsurprisingly, the relationship soured after the parties signed their contract. Noble Capital repeatedly placed its own money into the Fund, while USCGIM failed to raise any investment capital. USCGIM informed Plaintiffs that they Fund would be listed on TD Ameritrade once it raised $10 million, so Plaintiffs placed that amount of money into the Fund. (Am. Compl., Dkt. 40, at 10). After nothing happened, Plaintiffs allege that USCGIM raised the figure to $20 million, but the Fund was never listed on TD Ameritrade. (*Id.* at 14). In total, the Feeder Funds placed $21 million into the Fund, while $4 million came from investment advisers affiliated with Noble Capital. (Ragland Decl., Dkt. 115-1, at 2–3). Plaintiffs allege "USCGIM has not placed a single investment dollar into the Fund." (*Id.*). Despite not raising any money, USCGIM repeatedly asked Plaintiffs to contribute to fundraising efforts. Noble Capital paid $20,000 for a promotional marketing event, but alleges that USCGIM used the event to market for other investment companies. (*Id.* at 5). Emails

between the parties show Noble Capital repeatedly inquiring about the event, but being told to hold

tight and be patient. For example, Noble Capital's Chief Operating Officer emailed,

> Gents,
> We are discouraged over here, to say the least. Tomorrow it will have
> been two weeks since I requested a follow-up pipeline for this event
> and four weeks since the actual event. While I think the event was
> solid and well attended by target rich prospects, we have zero to
> show for it. I can't seem to get a straight answer on how many people
> attended, much less what a follow-up and conversion pipeline looks
> like.

(Ragland Email, Dkt. 115-1, at 21).

At the same time, USCGIM billed Noble Capital $58,000 for the Fund's management,

despite not having raised any capital for the Fund. Ultimately, Plaintiffs claim that USCGIM billed

them more than $270,000 for work to find placement agents for the Fund, although they never

actually found investors willing to raise money. (Am. Compl., Dkt. 40, at 8–9). Similarly, USCGIM

told Noble Capital that it would gain investor money once the Fund passed an audit. (*Id.* at 11).

Noble Capital paid for the audit but received no investor money in return. (*Id.*). Executives at Noble

Capital grew increasingly upset with USCGIM, emailing,

> So far I have paid $100k and now I have an invoice for an additional
> $58k, all so I can raise money from my own pool of investors into a
> fund that I don't control? Seriously... just think about it. Not a single
> dollar has come from your team, your channels, your network, your
> connections. And now I need to pay $58k for the privilege?

(Ragland Email, Dkt. 115-1, at 19).

The relationship eventually broke down entirely. USCGIM suggested Noble Capital break

down the Feeder Funds and collapse them into the Fund, managed by USCGIM, which Noble

Capital flatly refused. (*Id.* at 13–14). Noble Capital began to refuse to pay placement fees, because

USCGIM had failed for over a year to place any listing agents for the Fund. (*Id.*). In response,

USCGIM began to refuse to loan out the Fund's money, citing a previously unknown requirement

that the Fund have liquidity of at least $500,000. (Mgbolu Email, Dkt. 115-1, at 35–36). The result was that investor money in the Fund sat idle, generating no return. (Am. Compl., Dkt. 40, at 14-15).

USCGIM tells a different story. It alleges that it "created and implemented a substantial marketing campaign" with press releases to brokers across the globe. (Mot. Summ. J., Dkt. 114, at 5). And it points to the events it hosted where it identified investors. (*Id.*). USCGIM also notes that it charged no placement agent fees for investor income that came from Noble Capital's own contacts. (*Id.*). USCGIM also alleges that Noble Capital mismanaged and misled it about the Fund's assets. (*Id.* at 5–6). It states that Noble Capital lent the Fund's money to borrowers who were at risk of default and engaged in improper accounting to hide the losses. (*Id.*). It alleges that when the Fund required Noble Capital to take on the role of borrower for the foreclosed properties, Noble Capital instead retaliated and initiated arbitration and retaliation against USCGIM and US Capital. (*Id.* at 6–7).

Whether to recoup its financial losses or out of retaliation, Noble Capital met with USCGIM representatives in late 2018, stating that it planned to file an arbitration proceeding against the company to recoup the investor money they had placed into the Fund. According to Plaintiffs, Steele offered to return the money if Noble Capital paid them one million dollars. (*Id.* at 18). The parties then entered arbitration under the JAMS arbitration rules in 2019. However, USCGIM stated that it would use the Fund's assets to cover its arbitration, and began dissipating the Fund's assets, prompting Noble Capital to seek an emergency injunction from the arbitrator. (*Id.* at 20). In July 2019, the arbitrator entered an award noting that Noble Capital as likely to prevail on the merits of its fraud claim. (*Id.* at 21). It enjoined USCGIM from using the Fund to pay for USCGIM's legal defense and required USCGIM to provide Noble Capital with access to view the Fund's usage. (Emergency Award, Dkt. 5-1, at 138). The arbitrator then issued an additional award in October,

reiterating that USCGIM could not spend or dispose of partnership capital. (October Award, Dkt. 5-1, at 173).

In August 2020, however, the Fund claimed that it no longer had any remaining capital and could not pay its arbitration fees. The Fund requested that Noble Capital cover its arbitration fees and moved to make Noble Capital pay for its fees. (Arbitration Order, Dkt. 5-1, at 186). On August 26, the JAMS Case Manager notified all counsel of record that: "The Panel has decided to issue a decision on the Motion on August 31st." (Dkt. 12-2, at 2). Plaintiffs then notified the JAMS panel via email that they would be responding to the motion for fees by August 31, 2020. (*Id.*). The JAMS case manager responded, "Noted. Thank you." (*Id.*). However, at noon on August 31, the JAMS panel issued its order, before Noble Capital filed its response. (*Id.* at 3). It granted US Capital's motion to close the arbitration due to the Fund's unpaid fees. The arbitration officially closed in October 2020.

Meanwhile, in December 2019, Noble Capital sued US Capital, Sweeney, Towle, and Steele in this Court. *Noble Cap. Grp., LLC v. US Cap. Partners, Inc.*, No. 1:19-CV-01255-LY (W.D. Tex. Dec. 27, 2019) ("*NCFM's First Suit*"). Defendants moved to compel arbitration and dismiss the suit pursuant to the agreements' arbitration suits. *Id.* (Mot., Dkt. 17). The Court agreed and dismissed Noble Capital's claims. *Id.* (Order, Dkt. 30). Noble Capital appealed, but the Fifth Circuit affirmed. *Noble Cap. Grp., L.L.C. v. US Cap. Partners, Inc.*, No. 20-50721, 2021 WL 3477481, at *1 (5th Cir. Aug. 6, 2021) ("*Noble Cap. I*").

Plaintiffs tried again, initiating the instant action in state court. (Pet., Dkt. 1-4). Plaintiffs brought claims for fraud, conversion, breach of fiduciary duty, breach of contract, and tortious interference. (*Id.*). USCGIM removed the action to this Court. (Notice of Removal, Dkt. 1). USCGIM again moved to compel arbitration. This time, the Court denied the motion, noting that the Court could not compel arbitration when the arbitration had been terminated. USCGIM

appealed, but the Fifth Circuit again affirmed, noting that arbitration "has been had." *Noble Cap. Fund Mgmt., L.L.C. v. US Cap. Glob. Inv. Mgmt., L.L.C.*, 31 F.4th 333, 336 (5th Cir. 2022) ("*Noble Cap. II*").

Plaintiffs amended their complaint on September 28, 2022, to add US Capital, Sweeney, Towle, and Steele as Defendants. These Defendants also moved to compel arbitration, and the Court granted their motion, noting that they were not parties to the previous arbitration, and they "had not had" arbitration. (Order, Dkt. 110). USCGIM filed the instant motion for summary judgment on July 21, 2023. (Mot. Summ. J., Dkt. 114). USCGIM argues that Plaintiffs' claims are barred because they materially breached the MASA and LPA by allowing the Fund to default in arbitration. (*Id.* at 11). USCGIM also contends that Plaintiffs disclaimed fraud by signing the various agreements and their respective merger clauses. (*Id.* at 12–15). Finally, USCGIM disputes whether Plaintiffs have provided sufficient evidence for conversion, breach of fiduciary duty, breach of contract, and tortious interference. (*Id.* at 15–20).

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of

evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). Courts must view the summary judgment evidence in the light most favorable to the nonmovant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

### III. DISCUSSION

USCGIM raises several arguments in support of its motion for summary judgment, including: (1) that Plaintiffs defaulted in arbitration and therefore breached the governing agreements, (2) that no material evidence supports a valid claim for fraud, (3) that the Feeder Funds disclaimed reliance under Delaware law and cannot show an intent to deceive, (4) that USCGIM cannot be held liable for honest mistakes and good faith, (5) no material evidence supports their count for conversion, (6) no material evidence supports a breach of fiduciary duty, (6) USCGIM did not breach its contract, and (7) no material evidence supports tortious interference. The Court will address each argument in turn.

### A. Default in Arbitration

USCGIM argues that Plaintiffs' claims should be dismissed with prejudice in full because they breached the LSA by defaulting in arbitration. This argument has been thoroughly addressed, (Order, Dkt. 110; R. & R., Dkt. 105; Order, Dkt. 23); *Noble Cap. Fund Mgmt., L.L.C. v. US Cap. Glob. Inv. Mgmt., L.L.C.,* 31 F.4th 333, 336 (5th Cir. 2022) ("*Noble Cap. II*")). As this Court has already held, Noble Capital had no obligation to voluntarily pay the costs of the Fund in the arbitration when that non-party was in the control of USCGIM. The Fifth Circuit has already held that

USCGIM cannot compel arbitration on the grounds that the Fund defaulted. *Noble Cap. II*, 31 F.4th at 336. For much the same reason, USCGIM cannot obtain dismissal of Plaintiffs' claims on the same grounds.

USCGIM cites several cases suggesting that a party cannot enforce an agreement when it has defaulted in arbitration concerning that agreement. (Mot. Summ. J., Dkt. 114, at 12). But those cites all deal with a party which has itself defaulted in arbitration, not the default of a third party, as was the case here. The Court is unaware of any caselaw suggesting that a third party's default precludes enforcement from another party, and that especially cannot be the case when the defendant controlled the defaulting entity. And the cases that USCGIM cites suggest a defaulting party cannot later seek to *enforce* the arbitration agreement, not that their causes of action are entirely barred. *See Pre-Paid Legal Servs., Inc. v. Cahill*, 786 F.3d 1287, 1294 (10th Cir. 2015) (denying defaulting party's ability to compel arbitration); *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1011 (9th Cir. 2005) (same); *Freeman v. SmartPay Leasing, LLC*, 771 F. App'x 926, 932 (11th Cir. 2019) (same). Plaintiffs do not seek to enforce any of the agreements. Rather, they seek to recover money damages for past breaches. In short, there is simply no applicable caselaw to support the notion that Plaintiffs' claims are barred in their entirety by the Fund's default.

### B. Genuine Issues of Fraud Exist

USCGIM next argues that Plaintiffs cannot allege misrepresentation because the alleged misrepresentations were too vague to be actionable and because the MASA negates any reliance on misrepresentation. (Mot. Summ. J., Dkt. 115, at 12–15). Plaintiffs allege various acts of fraud against USCGIM, including a promise to "deliver hundreds of millions of dollars in investor capital," despite knowing that it could not deliver on this promise. (Am. Compl., Dkt. 40, at 28–29). Plaintiffs also alleges that USCGIM represented it could match the contribution by raising another $250

million. Noble Capital alleges that it placed $25 million into the Fund in reliance on this misrepresentation. (*Id.*).

### 1. Texas Law Applies to the Fraud Claims

First, the Court must answer the choice of law question. USCGIM alleges California law should apply because it governs the MASA.[3] Both the PAA and the MASA state that "This Agreement shall be governed by the law of the State of California." (MASA, Dkt. 5-1, at 88, PAA, Dkt. 35-4, at 5). The same language is used by the LPA, but for Delaware law. The phrase "This Agreement shall be governed" is a narrow choice-of-law clause and does not encompass the entire relationship between the parties. *See Texas Taco Cabana, L.P. v. Taco Cabana of New Mexico*, 304 F. Supp. 2d 903, 908 (W.D. Tex. 2003). Claims for fraud and misrepresentation do not depend on the construction and interpretation of the contract, and instead sound in tort. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003). The choice-of-law provision does not apply to the fraud claims. Instead, the Court applies the "substantial relationship" test, as used by Texas courts. *Id.* at 727. Here, the most substantial relationship is to Texas, because the partnership dealt with real estate investment for Texas, Noble Capital and the Feeder Funds were located in Texas, and the Fund was established to create investment in Texas. USCGIM does not dispute this argument. (*See generally* Def.'s Reply, Dkt. 117); *see also US Cap. Global Inv. Mgmt., LLC v. Noble Cap. Grp., LLC*, No. 1:22-CV-626-DAE, Doc. No. 24, at 7 (W.D. Tex. July 31, 2023) (noting same in related case). Accordingly, Texas law applies to the fraud claims under the MASA, PAA, and LPA.

### 2. Plaintiffs Disclaimed Reliance

Before addressing whether Plaintiffs' reliance was otherwise reasonable, the Court will address whether it is barred by disclaimer provisions in their contracts. USCGIM argues that the

---

[3] Under California law, "misrepresentations must pertain to past or existing material facts." (Mot. Summ. J., Dkt. 115, at 13 (quoting *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 169 Cal. Rptr. 3d 619 (2014))). Because USCGIM's promise to raise $250 million was a statement regarding future events, USCGIM contends that it is not actionable in fraud under California law.

claims are barred, because both contracts disclaim reliance on material outside the contract. (Mot. Summ. J., Dkt. 114, at 15). Plaintiffs argue that the contracts only use standard merger clauses and do not specifically disclaim reliance.

The Texas Supreme Court has held that "'standard' merger clauses 'without an expressed clear and unequivocal intent to disclaim reliance or waive claims for fraudulent inducement, have never had the effect of precluding claims for fraudulent inducement.'" *LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 460 (5th Cir. 2011) (*quoting Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 334 (Tex. 2011)). To negate a fraudulent inducement claim, "a clause must expressly disclaim reliance on prior representations or expressly waive fraud claims." *Id.*

Two recent Texas Supreme Court cases set guidelines for the level of specificity required. In 2011 in *Italian Cowboy*, the Supreme Court dealt with a contract that said, "Tenant acknowledges that [Landlord has not] made any representations or promises with respect to the Site, the Shopping Center or this lease except as expressly set forth herein." *Italian Cowboy*, 341 S.W.3d at 328. The Texas Supreme Court found that the language only disclaimed external representations, not reliance. *Id.* at 334. As a result, it considered it no more than a standard merger clause and allowed the claim of fraudulent inducement. *Id.* In 2019, however, the Texas Supreme Court dealt with another contract, stating, "[Plaintiff] is not relying upon any representation made by on or behalf of [Defendant] that is not specified in the Agreement." *Int'l Bus. Machines Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019) ("*IBM*"). The agreement went on to explicitly state that the parties were not relying on any specific acts or completion dates. *Id.* at 228–29. The Texas Supreme Court held that this contract was sufficiently specific to disclaim reliance and bar claims for fraudulent inducement. *Id.* at 230.

Noble Capital and the Feeder Funds signed separate agreements with USCGIM, so the Court must examine whether each agreement "expressly disclaim[ed] reliance" or waived fraud claims. The MASA and PAA contain highly similar language. Both use a standard merger clause. The MASA states, in full:

> This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, superseding all prior understandings and agreements whether written or oral.

(MASA, Dkt. 5-1, at 87).

The PAA uses virtually the same language, stating, "The Agreement represents our entire understanding relating to the Engagement and supersedes prior understandings whether written or oral." (PAA, Dkt. 35-4, at 7).

This is precisely the sort of standard merger clause that was held not to preclude fraudulent inducement claims in *Italian Cowboy*, 341 S.W.3d at 334; *Sysco Merch. & Supply Chain Servs., Inc. v. Remcoda, LLC*, No. 4:22-CV-2075, 2023 WL 1781810, at *6-7 (S.D. Tex. Feb. 6, 2023) (reliance not disclaimed in standard merger clause); *Skaria v. Abbott Labs., Inc.*, No. 3:20-CV-1203, 2021 WL 3772389, at *9-10 (N.D. Tex. Aug. 25, 2021) (same).

However, both the PAA and MASA have separate provision requiring the parties to arbitrate disputes. Within that arbitration provision, the contracts both state, "No promises or representations have been made to [Noble Capital] to induce [Noble Capital] to sign this Agreement." (PAA, Dkt. 35-4, at 8; MASA, Dkt. 5-1, at 90). This is closer, but still falls short of an unequivocal waiver of reliance. *See IAS Servs. Grp., L.L.C. v. Jim Buckley & Assocs., Inc.*, 900 F.3d 640, 650–51 (5th Cir. 2018); *Italian Cowboy Partners*, 341 S.W.3d at 333. The contract language falls between *Italian Cowboy* and *IBM*. At the very least, it is ambiguous as to whether the MASA and PAA waive fraudulent inducement claims. But because waivers require "clear and unequivocal language," ambiguity will not suffice. *Id.* "If the contract is subject to two or more reasonable interpretations,

then 'the contract is ambiguous, creating a fact issue on the parties' intent.'" *IAS Servs.*, 900 F.3d at 651 (quoting *Italian Cowboy Partners*, 341 S.W.3d at 333)).

Although the contract may disclaim reliance, its language is less than unequivocal. The contract itself says nothing about "reliance" or "waiver." The clause does deny any promise "to induce" but it does not disclaim reliance on those promises. Rather, the contract simply states that those promises have not been made. *See Italian Cowboy*, 341 S.W.3d at 334 ("Standard merger clauses, however, often contain language indicating that no representations were made other than those contained in the contract, without speaking to reliance at all."). The language more closely "disclaim[s] the *fact* that no other representations were made" than it does "disclaim[] its reliance" on those representations. *Id.* at 335. Importantly, the contract falls within a section on arbitration, suggesting that it functions more like a merger clause than a disclaimer. Because the waiver is ambiguous, the PAA and MASA do not disclaim reliance as a matter of law, and claims of fraudulent inducement to sign those contracts can proceed to trial.

The LPA, however, contains a clearer waiver of reliance. In relevant part, it states,

> This Agreement . . . contains the entire understanding and agreement by and among the Partners, and supersedes any prior written or oral agreement between them respecting the Partnership, and any and all other written or oral agreements or communications between or among the Partners and any and all agents of the Partnership. . . . There are no representations, agreement, arrangements, or understandings, oral or written, among the Partners relating to the Partnership which are not fully expressed in this Agreement . . . and no Limited Partner has executed and entered into this Agreement, or given another party a power of attorney to execute this Agreement on its behalf, in reliance on any representation, arrangement, agreement or understanding, oral or written, that is not expressed in this Agreement . . . ."

(LPA, Dkt. 5-1, at 73–74).

Another clause states,

> "Each Partner separately represents and warrants that he/she/it is not a party to any pending or threatened suit, action or legal,

administrative, arbitration or other proceeding which might materially and adversely affect the business of the Partnership or the transactions contemplated by this Agreement, nor such Partner know of any facts which are likely with the passage of time to give rise to such a suit, action or Each Partner separately represents and warrants that he/she/it is not a party to any agreement, understanding, commitment or other obligation that prohibits or restricts such Partner's under this Agreement."

(*Id.* at 76).

Thus, the LGA does specifically disclaim reliance. Plaintiffs argue that the waiver does not "sufficiently disclaim reliance." (Pls.' Resp., Dkt. 115, at 13). This argument is doubtful: the LPA states, "[N]o Limited Partner has executed and entered into this Agreement . . . in reliance on any representation, arrangement, agreement or understanding, oral or written, that is not expressed in this Agreement . . . ." (LPA, Dkt. 5-1, at 73). This is a specific disclaimer of reliance. Plaintiffs do not identify any ambiguity in the statement, and its effect is unequivocal: parties cannot rely on extrinsic statements.

When the parties sign an unequivocal waiver, the Court must then examine whether "(1) the terms of the contract were negotiated, rather than boilerplate; (2) during negotiations, the parties specifically discussed the issue that became the topic of the subsequent dispute; (3) the complaining party was represented by counsel; (4) the parties dealt with each other in an arm's length transaction; and (5) the parties were knowledgeable in business matters." *Italian Cowboy*, 341 S.W.3d at 332 (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997)). Each factor appears to favor USCGIM. The terms of the contract were negotiated, they specifically discussed the fundraising, they were represented by counsel, dealt with each other at arm's length, and were knowledgeable in business matters. (Def.'s Reply, Dkt. 117, at 7). Accordingly, the Feeder Funds may not bring claims for fraudulent inducement under the LPA.

The Feeder Fund's inability to claim fraudulent inducement does not mean that they have no viable fraud claims. The Feeder Funds may still bring claims for fraud that do not rely on extrinsic

statements made before the LPA was signed. For example, the LPA states that the parties were not subject to legal action or know of any facts likely to give rise to such a suit. (LPA, Dkt. 5-1, at 77). In fact, it appears likely that USCGIM and its parent company was subject to pending and threatened legal action. *See CTX Virtualtechnologies Inc. v. US Cap. Partners, Inc.*, No. CGC-12-521097 (Cal. Super. Ct., San Francisco Cnty.); *Riverside Res. LLC v. US Cap. Partners LLC*, No. CJ-2012-5560 (Okla. Dist. Ct., Tulsa Cnty.), *Sagent Energy, LLC v. US Cap. Partners, LLC*, No. 3:14-CV-5432 (N.D. Cal.), *Brooklands, Inc. v. Sweeney*, No. 9:14-cv-81298 (S.D. Fla.), *MCW Energy Grp v. US cap. Partners Inc.*, No. BC-566570 (Cal. Super. Ct., Los Angeles Cnty.); *Rapid Auto Loans, LLC v. U.S. Cap. Partners, Inc.*, No. 16-CV-62066 (S.D. Fla.). Plaintiffs repeatedly emphasize that they would not have signed any agreement with USCGIM if they had known about the pending and past legal actions against the company. (Pls.' Resp., Dkt. 115, at 11). Even assuming that the LPA disclaims other forms of reliance, it does not disclaim reliance on statements within the contract itself. And it is also an open question of fact as to whether the Feeder Funds would have disclaimed other reliance if it had known about the legal action for similar allegations of fraudulent misconduct.

Nor do the disclaimers apply to fraud that occurred after the contract was signed. USCGIM only moves for summary judgment on the claims of fraudulent inducement to enter into the Agreements. (Mot. Summ. J., Dkt. 114). However, Plaintiffs also include a claim for string-along fraud, which by its nature involves conduct that happens after a contract is signed. (Am. Compl., Dkt. 40, at 28). This potentially fraudulent conduct includes, for example, the representation that the Fund would be listed on TD Ameritrade if Noble Capital placed $10 million into the Fund, even though the Fund was never listed. (*Id.* at 10). And it includes claims that USCGIM continued to collect fees despite making no efforts to raise institutional capital. Plaintiffs may still bring claims for any fraudulent statements made after the contract was signed.

### 3. Material Questions of Fact Exist for Justifiable Reliance

Under Texas law, a claim for fraud requires (1) a material misrepresentation; (2) made with knowledge of its falsity or asserted recklessly without knowledge of its truth; (3) made with the intention that it should be acted upon; (4) which the other party relied on; and (5) the party was injured as a result. *See, e.g.*, *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). Plaintiffs have shown the first four elements, alleging: USCGIM materially misrepresented its ability to raise capital, USCGIM lacked the actual capacity to do so, the misrepresentation induced Plaintiffs into signing the agreements as a result, and Plaintiffs actually did rely on the representations. (Am. Compl., Dkt. 40, at 18–29; Ragland Decl., Dkt. 115-1, at 3–5; Collins Decl., Dkt. 115-2, at 2). Finally, Plaintiffs were injured by the reliance, because they continuously invested money into the Fund and paid USCGIM's fees, but USCGIM lacked the actual capacity to raise the required capital. (Ragland Decl., Dkt. 115-1, at 5–6; Sweeney Depo., Dkt. 115-3, at 9).

USCGIM does not focus its argument on these elements, but instead emphasizes that reliance on any misrepresentation was not actionable in fraud. (Mot. Summ. J., Dkt. 114, at 12–18). USCGIM contends that the statements it made to Noble Capital were too vague for Noble Capital to realistically rely upon them. USCGIM characterizes its statements as mere statements of intent, which are not actionable in fraud in California. (*Id.* at 13 (quoting *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 169 Cal. Rptr. 3d 619 (2014))). However, Texas law, not California law, applies. And in Texas, a party may justifiably rely on a false promise of future performance if it is (1) sufficiently certain and (2) made with no intent of performing at the time it was made. *See, e.g.*, *Taylor Elec. Servs., Inc. v. Armstrong Elec. Supply Co.*, 167 S.W.3d 522, 527 (Tex. App.—Fort Worth 2005, no pet.). At summary judgment, then, Plaintiffs need only show a material dispute of fact as to these elements.

Plaintiffs have made this showing. USCGIM allegedly promised to raise $250 million, that it had several multi-million-dollar investors ready to raise capital, and that it would help tremendously

in the retail space. (Pls.' Resp., Dkt. 115, at 6; Ragland Decl., Dkt. 115-1, at 3–5; Collins Decl., Dkt. 115-2, at 2). USCGIM represented that it could "move forward quickly with the capital raise [with] our substantial investor community." (Am. Compl., Dkt. 40, at 7; Emergency Arbitrator Award, Dkt. 5-1, at 149). It promised to "run a wide pitch to investment professionals, institutions, and high-net-worth investors so the offering is subscribed to quickly and with diversity." (Am. Compl., Dkt. 40, at 7; Emergency Arbitrator Award, Dkt. 5-1, at 149). These are sufficiently certain— USCGIM represented that it would raise investor money and had the capacity to do so. In fact, there is a genuine dispute about whether USCGIM had any intent to raise funds and may have entirely lacked the capacity to do so. (Pls.' Resp., Dkt. 115, at 11–17; Ragland Emails, Dkt. 115-1 (repeatedly noting continual disappointment in USCGIM's failure to raise any capital over several years)). USCGIM argues that the timeframe is too vague for the actions to be certain, but this argument is misplaced. (Def.'s Reply, Dkt. 117, at 8).[4] USCGIM's promise was sufficiently certain because it represented to undertake certain actions that it did not pursue at all—not just within a specific timeline. Moreover, "[j]ustifiable reliance usually presents a question of fact." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648 (Tex. 2018). It is thus for the jury, not this Court, to determine if any ambiguity render the reliance unjustifiable.

Similarly, there is a genuine issue of fact as to whether USCGIM had any intent to perform its obligations under the agreements. "Intent not to perform a promise at the time it was made may be shown by circumstantial evidence, including the subsequent conduct of the promisor." *Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1185 (5th Cir. 1993); *see Yeldell v. Goren*, 80 S.W.3d 634, 637 (Tex. App.—Dallas 2002, no pet.). "Slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is

---

[4] USCGIM also argues that Plaintiffs could not rely on any misrepresentation besides the promise to raise $250 million because misrepresentation must be the "but for" reason for signing a contract. A party may have several "but-for" reasons for signing a contract. Plainly, Plaintiffs relied on several statements as key, and potentially "but-for" reasons for signing the contracts. (*See generally*, Pls.' Resp., Dkt. 115, at 6–13).

sufficient to support a finding of fraudulent intent." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432,

435 (Tex. 1986). Several pieces of evidence create a genuine factual dispute here. First, USCGIM

denied the promise had been made, which is circumstantial evidence of no intent to perform. *Id.*

(citing *Stone v. Williams*, 358 S.W.2d 151, 155 (Tex. App.—Houston 1962, writ ref'd)). USCGIM

represented that they had never been sued, when it and its related entities had faced several lawsuits

in the preceding years. (Pls.' Resp., Dkt. 115, at 9 n.5 (listing cases where USCGIM or US Capital

was sued)). According to Plaintiffs, USCGIM falsely claimed it could not make written statements

about its ability to raise capital because of FINRA rules and regulations. (*Id.*). And Plaintiffs allege

that USCGIM's minuscule efforts to raise funds, such as including it in their newsletter, were grossly

disproportionate with raising $250 million. Overall, there are several issues of fact as to USCGIM's

intent to deceive.

### 4. Reliance was Justifiable

USCGIM contends that Plaintiffs' reliance was not justifiable. Under Texas law, a plaintiff

must show actual and justifiable reliance. *See, e.g.*, *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583

S.W.3d 553, 558 (Tex. 2019); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923

(Tex. 2010). Several allegations support a reasonable reliance on USCGIM's statements. USCGIM

held itself out to Plaintiffs as having special knowledge in how to raise institutional capital. (Sweeney

Depo., Dkt. 115-3, at 201). USCGIM told Plaintiffs that they had not been sued for past violations

or fraud claims, which was allegedly false. (Pls.' Resp., Dkt. 115, at 11). And although Noble Capital

had some knowledge with raising capital, it had never partnered with another investment firm

before. (*Id.*). These factors all help justify Plaintiffs' reliance on USCGIM's statements.

To the extent that Plaintiffs' justifiable reliance is in question at all, it is a question of fact for

the jury. "The issue of justifiable reliance is generally a question of fact." *Jacked Up, LLC v. Sara Lee*

*Corp.*, 854 F.3d 797, 811 (5th Cir. 2017); *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*,

192 S.W.3d 20, 30 (Tex. App.—Houston 2005, pet. denied) ("[C]ourts have uniformly treated the issue of justifiable reliance as a question for the factfinder."). The justifiable reliance inquiry is necessarily fact intensive. "The question of justifiable reliance depends heavily on the relationship between the parties and their relative sophistication." *1001 McKinney*, 192 S.W.3d at 30. "[E]ven sophisticated buyers have the right to rely on the veracity of the financial information provided to them by the sellers." *San Antonio Properties, L.P. v. PSRA Invs., Inc.*, 255 S.W.3d 255 (Tex. App.—San Antonio 2008, pet. granted), *vacated and remanded pursuant to a settlement agreement*, No. 08-0518, 2008 WL 11535925 (Tex. Dec. 5, 2008). The parties may dispute whether it was unjustifiable for Plaintiffs to rely on the representations made by USCGIM, but they are not foreclosed as a matter of law. It is for the jury, not this Court, to decide whether reliance was justifiable.

### 5. Waiver is an Unpled Defense

Finally, USCGIM contends that it cannot be liable for fraud under the LPA because of a waiver provision for "honest mistakes of judgment." (Mot. Summ. J., Dkt. 114, at 16–18). However, USCGIM did not assert this defense in their answer, so it has been waived. *See Barnard Constr. Co., Inc. v. City of Lubbock*, No. 503-CV-269-C, 2004 WL 2173403, at *13 (N.D. Tex. Sept. 28, 2004) (citing *United States v. Burzynski Cancer Rsch. Inst.*, 819 F.2d 1301, 1307 (5th Cir. 1987)) ("An affirmative defense may be raised in a motion for summary judgment, but only if that motion is the first pleading responsive to the substance of the allegations. Failure to do so constitutes waiver."). USCGIM argues that it should not have to plead waiver because Delaware law does not allow a party to assert waived reliance. (Def.'s Reply, Dkt. 117, at 9–10). This argument is inapplicable because (1) Texas law applies to the fraud claims, (2) the waiver argument is separate from a disclaimer of reliance argument, and (3) waiver is an affirmative defense. *Hamorsky v. Allstate Vehicle & Prop. Ins. Co.*, 455 F. Supp. 3d 292, 297 (E.D. Tex. 2020) ("Waiver is an affirmative defense, and

the party alleging waiver has the burden of proof."). USCGIM failed to plead waiver and has thus waived the waiver defense.

Overall, Plaintiffs may proceed in large part on their claims for fraud and fraudulent inducement. While the Feeder Funds disclaimed fraudulent misrepresentation under the LPA, the remaining fraud claims survive summary judgment.

### C. Conversion

USCGIM argues that Plaintiffs cannot assert a claim for conversion under Delaware law. (Mot. Summ. J., Dkt. 114, at 19). Again, this mistakes the choice of law analysis. Because conversion is a tort that falls outside of the contract, it is governed by Texas law. *See infra*, Section III.B.1; *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971) (conversion is a tort in Texas law). To prevail on a claim for conversion of personal property, "a plaintiff must prove that: (1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property." *Apple Imps., Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex. App.–Austin 1997, writ denied).

Here, the Feeder Funds allege that they placed money into the Fund controlled by USCGIM and that USCGIM refused to return the money upon their demand. (Pls.' Resp., Dkt. 115, at 15). Section 7.2(d) of the LPA states that a Feeder Fund can withdraw money from the Fund upon request at least 20 days before the end of the relevant business quarter. (LPA, Dkt. 5-1, at 40). Plaintiffs allege that USCGIM was required to return the money upon this request. (Am. Compl., Dkt. 40, at 31). They further allege that a US Capital employee offered to "return investor money if Noble [Capital] paid them one million dollars," which was an unlawful demand (*Id.* at 18). And Plaintiffs allege that USCGIM used the Fund's assets to pay for arbitration against Plaintiffs. (*Id.* at

31). As a result, there is a material dispute about whether Plaintiffs had legal possession over the assets and whether USCGIM improperly kept and used those assets. And there is no dispute that Plaintiffs demanded the assets' return and that USCGIM refused. Accordingly, the claim survives summary judgment.

USCGIM appears to rely on the fact that LPA Section 7.2(g) allows the Fund, in "its sole and absolute discretion," to suspend withdrawal rights if withdrawal would be "seriously prejudicial to the Fund or the remaining Limited Partners." (*Id.* at 41). But whether these circumstances existed is a question of fact, and USCGIM must show that it genuinely did believe such circumstances existed. Because the "sole and absolute discretion" is modified by the requirement that USCGIM believe in a "seriously prejudicial" effect, the claim is not barred as a matter of law.

USCGIM further argues that the Noble Capital's taking of the funds in September 2019 moots the Feeder Funds' conversion claims. While recovery of the Funds may have mitigated Plaintiffs' harms, it does not "moot" them altogether. The Feeder Funds may still have been harmed by the conversion during the time the assets were wrongfully withheld, even if they eventually received some of the remaining assets.

### D. Breach of Fiduciary Duty

USCGIM next argues that there is no evidence to support Plaintiffs' breach of fiduciary duty claims. Here, USCGIM correctly applies Delaware law, because although breach of fiduciary duty is a tort, it arises out of the interpretation of the contract. *See Zodiac 21, Inc. v. Oyo Hotels, Inc.*, No. CV 20-63-SDD-RLB, 2020 WL 6479160, at (6 (M.D. La. Nov. 3, 2020) (applying choice-of-law provision to breach of fiduciary duty claims). In other words, breach of fiduciary duty depends on the contract when it is the contract itself that creates the fiduciary duty. *Id.* A Delaware claim for breach of fiduciary duty requires (1) that a fiduciary duty existed and (2) that the defendant breached that duty. *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub. nom. ASDI, Inc. v.*

*Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010). Delaware law imposes fiduciary duties of loyalty and care on general partners, and USCGIM is the general partner under the LPA. Del. Code tit. 6, § 15-404.

The LPA contains a waiver of breach of fiduciary claims, but it is not so absolute as to preclude summary judgment. The LPA states,

> "Any standard of care and duty imposed by this Agreement or under Delaware law or any applicable law shall be modified waived or limited, to the extent permitted by law, as required to permit the General Partner to act under this Agreement so long as such action is reasonably believed by the General Partner to be in, or not inconsistent with, the best interests of the Limited Partnership."

(LPA, Dkt. 5-1, at 68).

Delaware courts have held that this language does not waive claims of breach, but simply converts the duty into a contractual fiduciary duty. *See Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 362 (Del. 2013). Under this precedent, USCGIM still had a fiduciary duty to act in a way that it reasonably believed was in the best interests of the partnership. *Id.*

Plaintiffs have shown a material dispute about whether USCGIM could have reasonably believed their actions were in the best interests of the partnership. According to Plaintiffs, USCGIM used Fund assets to finance litigation against Plaintiffs and refused to fund loans in interest of the Fund. (Pls.' Resp., Dkt. 115, at 16–17). It used Noble Capital's money, in the Fund, to defend against Noble Capital's own arbitration. (*Id.*). While USCGIM may argue that this was in the partnership's best interest, that is a factual determination for the jury to make. *See, e.g.*, *In re Orchard Enters., Inc. S'Holder Litig.*, 88 A.3d 1, 31 (Del. Ch. 2014) (denying summary judgment on fiduciary duty claim because "[t]his is rather one of those frequent situations where it is desirable to inquire into and develop more thoroughly the facts at trial."); *Steinhouser v. Univ. of Delaware*, No. N18C-04-125-MMJ, 2019 WL 2359444, at *2 (Del. Super. Ct. June 4, 2019) (question of acting within best interest is one of fact). A finder of fact could determine that USCGIM's use of the funds was not in

the best interests of the parties and a breach of its fiduciary duty. Accordingly, summary judgment is improper.

### E. Breach of Contract

USCGIM seeks summary judgment on Plaintiffs' breach of contract claim because it says that no contractual provision required it to raise capital. (Mot. Summ. J., Dkt. 114, at 20). This misstates Plaintiffs' position. The breach of contract claim is not *just* that USCGIM raised no capital, but that it failed to employ reasonable efforts to do so. The PAA required USCGIM to "use reasonable efforts to identify suitable purchasers of [Limited Partner] interests." (PAA, Dkt. 35-1, at 1–2). But USCGIM did not do so, and a reasonable dispute of fact exists on this point. (Ragland Email, Dkt. 115-1, at 19 ("Not a single dollar has come from your [US Capital] team, your channels, your network, your connections."); Ragland Email, Dkt. 115-1, at 33 ("[Noble Capital] Still raised 100% of the Capital.")). A reasonable jury could find that the USCGIM's alleged lack of effort to identify purchases was a breach of its contractual obligations.[5] Likewise, a reasonable jury could find that USCGIM breached the PAA by paying itself Placement Agent Fees despite failing to identify and contact investors who actually placed money into the Fund. (Mot. Summ. J., Dkt. 115, at 19).[6]

Plaintiffs also claim that USCGIM breached the LPA and MASA by refusing to fund loans. The LPA authorized USCGIM to fund on an individualized basis as determined "in its sole and absolute discretion." (LPA, Dkt. 5-1, at 32). But this does not vest a party with total immunity under

---

[5] USCGIM argues that it was not a party to the PAA. This contradicts its own statement opposing Plaintiffs' motion for leave to file an amended complaint, where USCGIM claims that the PAA is "the entire agreement between the parties and dictates the obligations of USCGIM in terms of raising any of the capital, investments, or funds for the Fund which belies the plaintiffs' entire litigation theory." (Dkt. 35, at 10). And the PAA is signed by US Capital on behalf of USCGIM. (PAA, Dkt. 35-1, at 9).

[6] The parties severely under-brief whether the PAA compels arbitration, and whether that arbitration was a part of the underlying arbitration that ended in default. In the event that the dispute has not yet been arbitrated, then Plaintiffs' PAA breach claim is barred, except as to whether it constitutes a constructive breach of the MASA.

Delaware law, and they still must abide by their duty of loyalty to the limited partner and exercise good faith judgment. *See Cantor Fitzgerald, L.P. v. Cantor*, No. A.18101, 2001 WL 1456494, at *7 (Del. Ch. Nov. 5, 2001); *Houseman v. Sagerman*, No. 8897-VCG, 2021 WL 3047165, at *6 (Del. Ch. July 20, 2021) ("[S]ole and absolute discretion" clause "is equivalent to a duty of subjective good faith."). Again, a material dispute exists as to whether USCGIM acted in bad faith, so summary judgment is improper against Plaintiffs on this ground.

Plaintiffs' argument as to the MASA is based on the deprivation of its ability to manage real estate transactions and thereby receive the contractual advisory fee, because USCGIM did not fund the loans under the PAA. (Pls.' Resp., Dkt. 115, at 19). USCGIM argues that "MASA contains no such obligation" to fund loans. (Def.'s Reply, Dkt. 117, at 11). Plaintiffs contend that USCGIM's impeding constituted a breach by itself. (Pls.' Resp., Dkt. 115, at 19 (citing *RAI Indus. Fabricators, LLC v. Fed. Ins. Co.*, No. 5:16-CV-3674, 2018 WL 2047789, at *4 (N.D. Cal. May 2, 2018))). Undoubtedly, the inability to use the Fund's money restricted Noble Capital's ability to manage investments and make loans. Under California law, such impediments are considered as breaches of implied covenants. *Storek & Storek, Inc. v. Citicorp Real Est., Inc.*, 100 Cal. App. 4th 44, 122 Cal. Rptr. 2d 267, 276 (2002) (characterizing the withholding of loans as a breach of the convent of good faith). "The covenant of good faith and fair dealing [is] implied by law in every contract." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1369 108 Cal. Rptr. 3d 682 (2010). Even though the MASA did not obligate USCGIM to authorize loans, it contained the implied covenant that USCGIM would not, in bad faith, prevent Noble Capital from making investments and earning commissions on those investments. *See Harm v. Frasher*, 181 Cal. App. 2d 405, 417, 5 Cal. Rptr. 367 (Ct. App. 1960) ("The covenant also requires each party to do everything the contract presupposes the party will do to accomplish the agreement's purposes."). Because there is a material dispute of fact about

whether USCGIM acted in bad faith to prevent USCGIM from earning advisory fees, their claim for breach of contract under the MASA survives on that limited ground.

### F. Tortious Interference

Finally, Plaintiffs' tortious interference claim survives summary judgment. USCGIM argues that a general partner cannot tortiously interfere with the management of limited partners under Texas law. (Def.'s Reply, Dkt. 117, at 11 (citing *Prudential Ins. Co. of Am. V. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) and *Cmty. Health Sys. Prof' Servs. v. Hansen*, 525 S.W.3d 671, 690 (Tex. 2017)). Neither case USCGIM cites stands for this proposition. While it is true that a principal generally cannot sue its agent for tortious interference, neither case deals with general partners and limited partners.[7]

Assuming that the "clients" referenced in the complaint are the Feeder Funds, USCGIM's argument is still inapplicable. Agents usually may not tortiously interfere with the principal's contract because they are acting on the principal's behalf for purposes of the contract. Because the two are acting as the same entity, tortious interference is inapplicable because a party generally cannot be liable for interfering with its own contract. *Community Health*, 525 S.W.3d at 690–91. That is not the case here, where USCGIM was the general partner in a fund. The Feeder Funds were not the same legal entity, nor acting on USCGIM's behalf as agents. The logic of *Community Health* is inapplicable, and USCGIM cites no case that entering into a partnership immunizes the partners from tortiously interfering with the contracts of a limited partner. *See Zinda v. McCann St., Ltd.*, 178 S.W.3d 883, 891 (Tex. App.—Texarkana 2005, pet. denied) (finding tortious interference possible but unsupported between general and limited partner).

---

[7] Both cases also note that the rule against tortious interference with an entity's own contract, even as applied to principals and agents, is not absolute. *Community Health* notes that a party which "acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests" can be held liable, even if they are an agent of the principal. 525 S.W.3d at 691. *Prudential* notes the same standard. 29 S.W.3d at 79.

Noble Capital also appears to allege that USCGIM interfered with existing investors beyond the Feeder Funds. Noble Capital alleges that USCGIM interfered with these contracts by deliberately mismanaging the Fund so that the investors lost faith in Noble Capital. (Am. Compl., Dkt. 40, at 33). Plaintiffs' complaint appears to allege tortious interference with business relations— as opposed to interference with an existing contract. Under Texas law, a plaintiff alleging tortious interference with an existing business relationship must show (1) there was a reasonable probability that the parties would have entered into a business relationship; (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston 2006, pet. denied).

Plaintiffs have met these elements. Plaintiffs' complaint is full of assertions that USCGIM tried to improperly poach Noble Capital's existing investors. (*Id.* at 15 ("USCGIM's actions, including its refusal to fund loans, are calculated to disrupt Noble's relationships with its clients."); *id.* ("[L]ongtime Noble clients who are also limited partners in the Feeder Funds are complaining about the management of their investment, and some have cut ties with Noble."). Plaintiffs have pled harm, because they lost investor clients, and that USCGIM should have known this would result from their alleged interference. (*Id.* at 33; Britman Email, Dkt. 114-3 (noting complete dissatisfaction with Noble Capital because of the partnership with USCGIM). Accordingly, Plaintiffs' tortious interference claim survives.

## IV. CONCLUSION

For these reasons, USCGIM's Motion for Summary Judgment, (Dkt. 114), is **GRANTED IN PART** and **DENIED IN PART**. USCGIM's motion is **GRANTED** as to the Feeder Fund's claims for fraudulent inducement. USCGIM's motion is **DENIED** as to all other aspects as set forth in this order.

**SIGNED** on September 7, 2023.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE